*364 OPINION OF THE COURT
Alexander, J.
On April 10, 1989, Security Pacific International Bank (Security Pacific), a Federally chartered banking corporation with offices in New York City, mistakenly wired $1,974,267.97 on behalf of Spedley Securities (Spedley), an Australian corporation, into the account of Banque Worms, a French Bank, maintained with BankAmerica International (BankAmerica), another Federally chartered bank with New York offices. Initially intending to make payment on its debt to Banque Worms under a revolving credit agreement, Spedley instructed Security Pacific, which routinely effected wire transfers for Spedley, to electronically transfer funds from Security Pacific to Banque Worms’ account at BankAmerica.
A few hours after directing this wire transfer, Spedley, by a second telex, directed Security Pacific to stop payment to Banque Worms and to make payment instead to National Westminster Bank USA (Natwest USA) for the same amount. At the time Security Pacific received the telexes, Spedley had a credit balance of only $84,500 in its account at Security Pacific, but later that morning, Security Pacific received additional funds sufficient to cover the transaction and then began to execute the transaction. However, in mistaken disregard of Spedley’s second telex canceling the wire transfer to Banque Worms, Security Pacific transferred the funds into Banque Worms’ account at BankAmerica. The funds were credited to the account after Banque Worms was notified through the Clearing House Interbank Payment System (CHIPS) that the *365 funds had been received. That afternoon, Security Pacific executed Spedley’s second payment order and transferred $1,974,267.97 to Natwest USA. Spedley’s account at Security Pacific was debited twice to record both wire transfers thus producing an overdraft.
Meanwhile, at Security Pacific’s request made prior to the transfer to Natwest USA, BankAmerica agreed to return the funds mistakenly transferred, provided Security Pacific furnished a United States Council on International Banking, Inc. (CIB) indemnity. The indemnity was furnished and the funds returned to Security Pacific on the following day. Banque Worms, however, refused BankAmerica’s request that it consent to its account being debited to reflect the return of the funds. Consequently BankAmerica called upon Security Pacific to perform pursuant to the CIB indemnity and return the funds. Security Pacific’s attempt to obtain funds from Spedley to cover this indemnity was unavailing because by that time, Spedley had entered into involuntary liquidation.
Banque Worms brought suit against BankAmerica in the United States District Court for the Southern District of New York seeking to compel BankAmerica to recredit $1,974,267.97 to Banque Worms’ account. BankAmerica instituted a third-party action against Security Pacific for return of the funds, and Security Pacific counterclaimed against Banque Worms seeking a declaration that neither Bank Worms nor Bank-America were entitled to the $1,974,267.97. Eventually, for reasons not here pertinent, Security Pacific returned the funds to BankAmerica, BankAmerica recredited Banque Worms’ account and was voluntarily dismissed from the case leaving only Banque Worms and Security Pacific as the sole contestants seeking entitlement to the $1,974,267.97.
On their respective motion and cross motion for summary judgment, the District Court, applying the "discharge for value” rule, granted judgment for Banque Worms. Security Pacific appealed to the United States Court of Appeals for the Second Circuit, arguing that New York neither recognized nor applied the "discharge for value” rule in situations such as this; that the controlling rule under New York law was the "mistake of fact” rule pursuant to which, in order to be entitled to retain the mistakenly transferred funds, Banque Worms was required to demonstrate detrimental reliance. The case is before us upon a certified question from the Second Circuit (see, section 500.17 of the Court of Appeals Rules of *366 Practice [22 NYCRR]) inquiring "[w]hether in this case, where a concededly mistaken wire transfer by [Security Pacific] was made to [Banque Worms], a creditor of Spedley, New York would apply the 'Discharge for Value’ rule as set forth at section 14 of the Restatement of Restitution or, in the alternative, whether in this case New York would apply the rule that holds that money paid under a mistake may be recovered, unless the payment has caused such a change in the position of the receiving party that it would be unjust to require the party to refund.”
For the reasons that follow, we conclude that, under the circumstances of this case, the "discharge for value” rule should be applied, thus entitling Banque Worms to retain the funds mistakenly transferred without the necessity of demonstrating detrimental reliance.
I
A
In the area of restitution, New York has long recognized the rule that "if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery. The reason for the rule is obvious. Since A was mistaken in the assumption that he was indebted to B, the latter is not entitled to retain the money acquired by the mistake of the former, even though the mistake is the result of negligence.” (Ball v Shepard, 202 NY 247, 253.) This rule has been applied where the cause of action has been denominated as one for money had and received (Parsa v State of New York, 64 NY2d 143, 148), for unjust enrichment or restitution (Paramount Film Distrib. Corp. v State of New York, 30 NY2d 414, 421), or upon a theory of quasi contract (Miller v Schloss, 218 NY 400). Where, however, the receiving party has changed its position to its detriment in reliance upon the mistake so that requiring that it refund the money paid would be "unfair,” recovery has been denied (Paramount Film Distrib. Corp. v State of New York, supra, at 422; Ball v Shepard, supra, at 254).
This rule has evolved into the "mistake of fact” doctrine, in which detrimental reliance is a requisite factor, and which provides that "money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused *367 such a change in the position of the other party that it would be unjust to require him to refund.” (National Bank v National Mechanics’ Banking Assn., 55 NY 211, 213; see also, Hathaway v County of Delaware, 185 NY 368; Mayer v Mayor of City of N. Y., 63 NY 455, 457 ["general rule that money paid under a mistake of material fact may be recovered back * * * is subject to the qualification that the payment cannot be recalled when the position of the party receiving it has been changed in consequence of the payment, and it would be inequitable to allow a recovery.”].)
The Restatement of Restitution, on the other hand, has established the "discharge for value” rule which provides that "[a] creditor of another or one having a lien on another’s property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor’s mistake” (Restatement of Restitution § 14 [1]).
The question as to which of these divergent rules New York will apply to electronic fund transfers divides the parties and prompts the certified question from the Second Circuit. Security Pacific argues that New York has rejected the "discharge for value” rule and has required that detrimental reliance under the "mistake of fact” rule be demonstrated in all cases other than where the mistake was induced by fraud. Banque Worms, on the other hand, invokes the "discharge for value” rule, arguing that because it is a creditor of Spedley and had no knowledge that the wire transfer was erroneous, it is entitled to keep the funds. It points out, as indicated by the official comment to section 14 (1) of the Restatement of Restitution, that the "discharge for value” rule is simply a "specific application of the underlying principle of bona fide purchase” set forth in section 13 of the Restatement (Restatement of Restitution § 14, comment a).
Banque Worms cites to various decisions of New York courts in support of its contention that New York has adopted and applied the "discharge for value” rule (see, e.g., Ball v Shepard, 202 NY 247, supra; Consolidated Natl. Bank v First Natl. Bank, 199 NY 516, affg 129 App Div 538; Oddie v National City Bank, 45 NY 735). Indeed, both parties rely to a significant degree upon Ball v Shepard in support of their *368 respective positions. Security Pacific relies upon the Court’s observation in the first of two classes of cases discussed, that "the mistake of fact is usually one which arises inter partes, and in order to justify recovery in any such case it must appear that the defendant was not, in the first instance, entitled to receive the money; and that his circumstances have not been so changed through its receipt as to render it unjust to compel him to refund. ” (202 NY, at 256 [emphasis added].) Banque Worms, on the other hand, refers to the same discussion but relies upon the Court’s description of the second class where "the mistake of the payor is usually superinduced by the fraud of a third person and the payee is not only ignorant of the fraud or mistake, but receives the money in good faith in the regular course of business and for valuable consideration. ” (Id. [emphasis added].)
Indeed one may find, as does Banque Worms, language in a myriad of cases that arguably lends support to the proposition that New York, long ago, embraced the "discharge for value” rule (see, e.g., Carlisle v Norris, 215 NY 400, 415 ["If defendants received the proceeds in good faith and without any notice of any wrong and credited them on an indebtedness due them, plaintiff is not entitled to recover them back.”]; White v Continental Natl. Bank, 64 NY 316 [right of a party paying money to another to recover it from one who is not entitled to receive it, is well established]; Smith & McCrorken v Chatham Phenix Natl. Bank & Trust Co., 239 App Div 318, 320 ["where a bank honors and pays a check under a mistake of fact, it may sue for recovery of the money, at least, against one receiving payment thereon, who is not a bona fide holder for value.”]; see also, New York Tit. & Mtge. Co. v Title Guar. & Trust Co., 206 App Div 490, affd 237 NY 626; State Farm Mut. Auto. Ins. Co. v Stokos, 65 Misc 2d 316; see generally, 44 NY Jur, Payment, § 107).
On the other hand, cases can also be cited where the language employed supports the contrary view — that New York not only eschews the "discharge for value” rule, as Security Pacific argues, but also embraces exclusively the detrimental reliance rule-mistake of fact doctrine (see, e.g., Hathaway v County of Delaware, 185 NY 368, supra; Mayer v Mayor of City of N. Y., 63 NY 455, supra; National Bank v National Mechanics’ Banking Assn., 55 NY 211, supra; Citibank v Warner, 113 Misc 2d 748). These cases for the most part, however, present issues involving more traditional aspects of mistake and restitution, and do not satisfactorily *369 address the unique problems presented by electronic funds transfer technology.
While courts have attempted in wire transfer cases to employ, by analogy, the rules of the more traditional areas of law, such as contract law, the law of negotiable instruments and the special relations between banks, these areas are governed by principles codified in articles 3 and 4 of the Uniform Commercial Code. Various commentators found these efforts ineffective and inadequate to deal with the problems presented (see, Official Comment to UCC 4A-102; Revisions of UCC Article 4A Postponed Due to Federal Preemption, ABA is Told, 51 Banking Rep 282 [BNA] [Aug. 15, 1988]). As pointed out by the Official Comment to article 4A, "attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instruments law or the law of check collection have not been satisfactory” (Official Comment to UCC 4A-102, 2A ULA [Master ed], 1990 Supp Pamph; see also, Revisions of UCC Article 4A Postponed Due to Federal Preemption, ABA is Told, 51 Banking Rep 282 [BNA] [Aug. 15, 1988]). Consequently, it was concluded, as the Prefatory Note to the new article 4A of the UCC approved by the National Conference of Commissioners on Uniform State Law and the American Law Institute observes, that a new article was needed because "[t]here is no comprehensive body of law that defines the rights and obligations that arise from wire transfers.” (2A ULA [Master ed], at 143, 1990 Supp Pamph.)
B
Electronic funds transfers have become the preferred method utilized by businesses and financial institutions to effect payments and transfers of a substantial volume of funds. These transfers, commonly referred to as wholesale wire transfers,[1] differ from other payment methods in a number of significant respects, a fact which accounts in large measure for their popularity. Funds are moved faster and more efficiently than by traditional payment instruments, *370 such as checks. The transfers are completed at a relatively low cost, which does not vary widely depending on the amount of the transfer, because the price charged reflects primarily the cost of the mechanical aspects of the funds transfer (Prefatory Note to UCC art 4A). Most transfers are completed within one day and can cost as little as $10 to carry out a multimillion dollar transaction (see generally, Farley, Article 4A: Funds Transfers, NYS 7720-A, NYA 10431-A; Prefatory Note to UCC art 4A). The popularity of wholesale wire transfers is evidenced by the fact that nearly $1 trillion in transactions occur each day, averaging $5 million per transfer and on peak days, this figure often approaches $2 trillion (see generally, Ring, Wholesale Funds Transfers: New Article 4A to the UCC, NYA 10431-A, NYS 7720-A).
Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the CHIPS.[2] The CHIPS network handles 95% of the international transfers made in dollars, transferring an average of $750 billion per day (see generally, Note, Liability for Lost or Stolen Funds in Cases of Name and Number Discrepancies in Wire Transfers: Analysis of the Approaches Taken in the United States and Internationally, 22 Cornell Inti LJ 91 [1990]). These funds are transferred through participating banks located in New York because all of the banks belonging to the CHIPS network must maintain a regulated presence in New York. As a result, this State is considered the national and international center for wholesale wire transfers.
The low cost of electronic funds transfers is an important factor in the system’s popularity and this is so even though banks executing wire transfers often risk significant liability as a result of losses occasioned by mistakes and errors, the most common of which involve the payment of funds to the wrong beneficiary or in an incorrect amount (see, American Law Institute Approves UCC Article Governing Wire Transfers, 52 Banking Rep 1150 [BNA] [June 5, 1989]). Thus, a major policy issue facing the drafters of UCC article 4A was determining how the risk of loss might best be allocated, while preserving a unique price structure. In order to prevent or minimize losses, the industry had adopted and employed *371 various security procedures designed to prevent losses[3] such as the use of codes, identifying words or numbers, call-back procedures and limits on payment amounts or beneficiaries that may be paid.
As indicated above, it was the consensus among various commentators that existing rules of law did not adequately address the problems presented by these wholesale electronic funds transfers. Thus, the National Conference of Commissioners on Uniform State Laws (NCCUSL) and the American Law Institute (ALI) undertook to develop a body of unique principles of law that would address every aspect of the electronic funds transfer process and define the rights and liabilities of all parties involved in such transfers (Prefatory Note to UCC art 4A, op. cit.). After extensive investigation and debate and through a number of drafts, in 1989, both the NCCUSL and the ALI approved a new article 4A of the Uniform Commercial Code (see generally, Bailen, Baxter, Davenport, Rougeau, and Veltri, Commercial Paper, Bank Deposits and Collections, and Other Payment Systems, 45 Bus Law 2341 [Aug. 1990]). In 1990, the New York State Legislature adopted the new article 4A and incorporated it into the New York Uniform Commercial Code (NY UCC art 4-A).[4] Although the new statute, which became effective January 1, 1991, may not be applied retroactively to resolve the issues presented by this litigation, the statute’s legislative history and the history of article 4A of the Uniform Commercial Code from which it is derived and the policy considerations addressed by this legislation, can appropriately inform our decision and serve as persuasive authority in aid of the resolution of the issue presented in this case (see, Matter of Pell v Coveney, 37 NY2d 494; Matter of Albano v *372 Kirby, 36 NY2d 526; MVAIC v Eisenberg, 18 NY2d 1; see also, Shawmut Worcester County Bank v First Am. Bank & Trust, 731 F Supp 57 [D Mass]).
II
Both the NCCUSL and ALI drafters of article 4A and the New York Legislature sought to achieve a number of important policy goals through enactment of this article. National uniformity in the treatment of electronic funds transfers is an important goal, as are speed, efficiency, certainty (i.e., to enable participants in fund transfers to have better understanding of their rights and liabilities), and finality. Establishing finality in electronic fund wire transactions was considered a singularly important policy goal (American Law Institute Approves UCC Article Governing Wire Transfers, 52 Banking Rep 1150 [BNA] [June 5, 1989]). Payments made by electronic funds transfers in compliance with the provisions of article 4A are to be the equivalent of cash payments, irrevocable except to the extent provided for in article 4A (see, Assn of Bar of City of NY, Committee on Banking Law, Report on proposed New York UCC art 4-A; see also, Delbrueck & Co. v Manufacturers Hanover Trust Co., 609 F2d 1047, 1049-1051 [2d Cir] [once an electronic fund transfer is completed and the funds released, the transaction is final and irrevocable under the CHIPS system]).
This concern for finality in business transactions has long been a significant policy consideration in this State. In a different but pertinent context, we observed in Hatch v Fourth Natl. Bank (147 NY 184, 192) that "to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear”.
A consequence of this concern has been the adoption of a rule which precludes recovery from a third person, who as the result of the mistake of one or both of the parties to an original transaction receives payment by one of them in good faith in the ordinary course of business and for a valuable consideration (see, Ball v Shepard, 202 NY 247, supra). This rule is grounded in "considerations of public policy and convenience for the protection and encouragement of trade and commerce by guarding the security and certainty of business *373 transactions, since to hold otherwise would obviously introduce confusion and danger into all commercial dealings” (44 NY Jur, Payment, § 107; see also, Southwick v First Natl. Bank, 84 NY 420). We have previously held that from these considerations, "[t]he law wisely * * * adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration.” (Stephens v Board of Educ., 79 NY 183, 187-188.)
The "discharge for value” rule is consistent with and furthers the policy goal of finality in business transactions and may appropriately be applied in respect to electronic funds transfers. When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation.
We believe such an application accords with the legislative intent and furthers the policy considerations underlying article 4-A of the New York Uniform Commercial Code. Although no provision of article 4-A calls, in express terms, for the application of the "discharge for value” rule, the statutory scheme and the language of various pertinent sections, as amplified by the Official Comments to the UCC, support our conclusion that the "discharge for value” rule should be applied in the circumstances here presented.
Subject to certain exceptions not here relevant, NY UCC 4-A-209 (2) provides that a beneficiary’s bank accepts a payment order when the bank pays the beneficiary by crediting the beneficiary’s account and notifying the beneficiary of the right to withdraw the credit (see, UCC 4-A-209 [2] [a]; 4-A-405 [1] [i]). When a payment order has been accepted by the beneficiary’s bank, cancellation or amendment of that payment order is not effective unless, for example, the order was issued because of a mistake of the sender resulting in a duplicate payment order or an order that directs payment to a beneficiary not entitled to receive the funds (see, UCC 4-A-211 [3] [b] [i], [ii]). Where a duplicate payment order is erroneously executed or the payment order is issued to a beneficiary different from the beneficiary intended by the sender, the receiving bank in either case is entitled to recover the erroneously paid amount from the beneficiary "to the extent allowed by the law governing mistake and restitution” (see, UCC 4-A-303 [1], [3]).
*374 More specifically, UCC 4-A-303 (3) instructs that "[i]f a receiving bank executes the payment order of the sender by issuing a payment order to a beneficiary different from the beneficiary of the sender’s order and the funds transfer is completed on the basis of that error, the sender * * * [is] not obliged to pay the payment order[ ]. The issuer of the erroneous order is entitled to recover from the beneficiary * * * to the extent allowed by the law governing mistake and restitution.” The Official Comment to UCC 4A-303 from which the identical New York statute is derived, explains that although section 4A-402 (3) obligates the sender to pay the transfer order to the beneficiary’s bank if that bank has accepted the payment order, section 4A-303 takes precedence and "states the liability of the sender and the rights of the receiving bank in various cases of erroneous execution” (see, Official Comment to UCC 4A-303, comment 1, 2A ULA [Master ed], 1990 Supp Pamph).
Thus, as in the example discussed in comment 2, where the originator’s bank mistakenly directs payment of $2,000,000 to the beneficiary’s bank but payment of only $1,000,000 was directed by the originator, the originator’s bank is obligated to pay the $2,000,000 if the beneficiary’s bank has accepted the payment, although the originator need only pay its bank the $1,000,000 ordered. The originator’s bank ordinarily would be entitled to recover the excess payment from the beneficiary. The comment points out, however, that "if Originator owed $2,000,000 to Beneficiary and Beneficiary received the extra $1,000,000 in good faith in discharge of the debt, Beneficiary may be allowed to keep it. In this case Originator’s Bank has paid an obligation of Originator and under the law of restitution * * * Originator’s Bank would be subrogated to Beneficiary’s rights against Originator on the obligation paid by Originator’s Bank” (see, Official Comment to UCC 4A-303, comment 2, 2A ULA [Master ed], 1990 Supp Pamph).
A further example discussed in comment 3 of the Official Comment is of a duplicate payment order erroneously made, which transfers a second $1,000,000 payment to beneficiary’s bank and beneficiary’s bank accepts the payment. Although the originator’s bank is only entitled to receive $1,000,000 from the originator, it must pay $2,000,000 to beneficiary’s bank and would be relegated to a remedy the same as "that of a receiving bank that executes by issuing an order in an amount greater than the sender’s order. It may recover the overpayment from Beneficiary to the extent allowed by the *375 law governing mistake and restitution and in a proper case * * * may have subrogation rights if it is not entitled to recover from Beneficiary” (Official Comment to UCC 4A-303, comment 3, 2A ULA [Master ed], 1990 Supp Pamph).
Although it seems clear from these provisions of article 4A and the Official Comments that the drafters of UCC article 4A contemplated that the "discharge for value” rule could appropriately be applied in respect to electronic fund transfers, Security Pacific argues that to do so would undermine the low cost structure of wholesale electronic fund transfers and impose extraordinary risks upon banks implementing these enormously large transactions. This argument is unpersuasive. Article 4A contemplates, in the first instance, that a mistake such as occurred here can be effectively held to a minimum through the utilization of "commercially reasonable” security procedures in effecting wire transfers. These security procedures are for the purpose of verifying the authenticity of the order or detecting error in the transmission or content of the payment order or other communication (see, e.g., NY UCC 4-A-201).
For example, under NY UCC 4-A-202 (2), if a bank accepts a payment order that purports to be that of its customer after verifying its authenticity through an agreed upon security procedure, the customer is bound to pay the order even if the payment order was not authorized. The customer will be liable, however, only if the court finds that the security procedure was a "commercially reasonable” method of providing security against unauthorized payment orders (id.). If the bank accepts an unauthorized payment order without verifying it in compliance with a security procedure, the loss will fall on the bank.[5]
Other mechanisms for preventing loss are also provided for in the statute. A bank may avoid a loss resulting from the insolvency of a sending bank by accepting the payment order on the condition that it first receives payment from the sending bank (see, NY UCC 4-A-209 [2] [a] [ii]; [c]; 4-A-403 [1] [a], [b]; see also, American Law Institute Approves UCC Article Governing Wire Transfers, 52 Banking Rep 1150 [BNA] [June 5, 1989]; Prefatory Note to UCC art 4A [a receiving bank can *376 always avoid this risk by accepting a payment order after the bank has received payment]). Risk of loss can also be minimized by the institution keeping track of all transactions with a particular bank so that over-all debits and credits can be netted.
Application of the "discharge for value” rule to the circumstances presented here is particularly appropriate. The undisputed facts demonstrate that Security Pacific executed Spedley’s initial order directing payment to Banque Worms notwithstanding having already received a cancellation of that order. The District Court also found that the second transfer to Natwest USA was executed despite the fact that Spedley’s account did not have sufficient funds to cover this second transfer. Moreover, it appears that, as a creditor of Spedley, Banque Worms was a beneficiary entitled to the funds who made no "misrepresentation and did not have notice of the transferor’s mistake.”
Accordingly, we conclude, in answer to the certified question, that the "discharge for value” rule as set forth at section 14 of the Restatement of Restitution, should be applied in the circumstances in this case.
Chief Judge Wachtler and Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered as follows: New York would apply the "discharge for value” rule as set forth at section 14 of the Restatement of Restitution.

. The Official Comment to UCC 4A-102 notes that while most payments covered by article 4A are usually referred to as "wire transfers” and involve an electronic transmission, other types of transmissions such as letter, or other written communication or oral communication, are also covered, thus the broader term "funds transfer” is used in preference to the narrower term "wire transfer.” (2A ULA [Master ed], at 147,1990 Supp Pamph.)

. CHIPS is owned and operated by the New York Clearing House Association and the Federal Reserve Bank owns and operates Fedwire, the largest American wire transfer network.

. The Official Comment to UCC 4A-201 as drafted by the American Law Institute and National Conference of Commissioners on Uniform State Laws states that "it is standard practice to use security procedures that are designed to assure the authenticity of the message * * * [and] to detect error in the content of messages. * * * The question of whether loss that may result from the transmission of a spurious or erroneous payment order will be borne by the receiving bank or the sender or purported sender is affected by whether a security procedure was or was not in effect and whether there was or was not compliance with the procedure.” (2A ULA [Master ed], at 156-157,1990 Supp Pamph.)

. The new article 4A will regulate funds transfers other than consumer transactions governed by the Federal Electronic Fund Transfer Act of 1978 (15 USC § 1693 et seq.). It will not apply to consumer transactions such as check payments or credit card payments for the Federal EFTA will continue to govern these transactions. If any part of a fund transfer is covered by the EFTA, the entire funds transfer will be excluded from article 4A.

. Whether or not a particular security procedure is commercially reasonable is a question of law for the court, while whether the procedure was complied with is a question of fact (see, Official Comment to UCC 4A-203, comment 4, 2A ULA [Master ed], 1990 Supp Pamph).