[No. B061336. Second Dist., Div. Seven. Dec. 15, 1992.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS
ASSOCIATION, Plaintiff and Respondent, v.
FATANE SANATI et al., Defendants and Appellants.

## COUNSEL

Frank, Greenberg & Simone and Martin Simone for Defendants and Appellants.

Ivanjack, Lambirth & Aranoff, Larry G. Ivanjack and Elise A. Ross for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—In an action for unjust enrichment, money had and received, conversion, and declaratory relief, the trial court granted plaintiff's motion for summary judgment finding defendants had no defense to plaintiff's request for restitution for an erroneous fund transfer. Defendants appeal from the adverse judgment, claiming the trial court erroneously applied the common law pertaining to checks and negotiable instruments instead of the law specifically pertaining to funds transfers. We affirm.

### FACTS AND PROCEEDINGS BELOW

In 1963 Hassan and Fatane Sanati were married in Tehran, Iran. They lived in Iran until Mrs. Fatane Sanati moved with their two children to Los Angeles in 1983. Between 1983 and 1987 Mr. Sanati spent nearly half his time living in Los Angeles. In 1987 Mr. Sanati permanently left the United States.

When Mr. Sanati left, he arranged for payments to be made to Mrs. Sanati in Los Angeles. He instructed Bank of America in London to send interest, as it accrued monthly from an account held in his name only, to an account he held jointly at Bank of America with Mrs. Sanati in Tarzana, California. The amount of each interest payment was between $2,000 and $3,000.

On April 30, 1990, Bank of America in London erroneously sent the principal of Mr. Sanati's bank account as well as the accrued interest to the joint Sanati account in Tarzana, California. The amount of the erroneous fund transfer was $203,750. The next day Mrs. Sanati authorized her children to withdraw $200,000 from this account. These funds were then deposited into various bank accounts under Mrs. Sanati's and her children's names.

Bank of America (bank) immediately realized its error and requested reimbursement for the erroneous payment. Mrs. Sanati and her children, Babak and Haleh Sanati (collectively Sanatis or defendants) refused the bank's requests.

In July 1990, the bank filed a complaint against the Sanatis seeking restitution for the amount of the erroneous payment. Eventually Mr. Sanati's bank account in London was recredited the amount of the principal transferred without his authority and he was dismissed as a defendant in the action. The remaining parties stipulated the funds from the erroneous transfer would be placed in a blocked account at the bank pending resolution of the litigation.[1]

The bank then moved for summary judgment. The trial court denied the bank's motion in order to allow the defendants to depose Mr. Sanati to determine whether he had altered his payment instructions to Bank of America in London in this instance. The trial court allowed an additional 90 days' continuance for this purpose. When 90 days elapsed and Mr. Sanati

---

[1] The parties stipulated to hold the remaining funds in a blocked account at the bank pending resolution of the litigation. The remaining funds amounted to approximately $187,000 because the Sanatis spent over $11,000 for a new car and made other purchases.

had not been deposed, the bank again moved for summary judgment, claiming it was entitled to judgment as a matter of law because the Sanatis had no defense to the bank's claim for restitution.

The trial court granted the bank's motion and this appeal followed.

## Discussion

### I. *Review of the Common Law Governing Erroneous Fund Transfers.*

At the time of the fund transfer in this case the law controlling the risks and liabilities of banks, beneficiaries and originators was general common law and equitable principles. Courts often borrowed concepts from articles 3 and 4 of the Uniform Commercial Code governing commercial paper and negotiable instruments as well. This sometimes resulted in inconsistent decisions and was generally determined to be an unsatisfactory method of allocating risks and responsibilities in these widely used transactions generally involving large sums of money. Ultimately the American Law Institute developed article 4A of the Uniform Commercial Code to specifically deal with fund transfers.[2] In 1990 the California Legislature adopted article 4A of the Uniform Commercial Code as division 11 of the California Uniform Commercial Code.

■ However, as stated, under the law in effect at the time of the fund transfer in this case, the general common law and equitable principles

---

[2]The comment to section 4A-102 of the Uniform Commercial Code defining fund transfers states:

"The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity, or they have sought guidance in statutes such as Article 4 which are applicable to other payment methods. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.

"In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in fund transfers. . . ." (Comment adopted and restated in full as comment to Cal. U. Com. Code, § 11102.)

controlled. Under the law as it then existed, the bank was entitled to restitution from the beneficiaries for the amount of the unauthorized transfer despite its negligence under general legal principles of mistake and unjust enrichment. (Rest., Restitution, § 59, com. a, p. 232; *American Oil Service, Inc.* v. *Hope Oil Co.* (1965) 233 Cal.App.2d 822, 830 [44 Cal.Rptr. 60]; *Frontier Refining Co.* v. *Home Bank* (1969) 272 Cal.App.2d 630, 634 [77 Cal.Rptr. 641]; *Aebli* v. *Board of Education* (1944) 62 Cal.App.2d 706, 724-725 [145 P.2d 601]; see also Annot., Recovery by Bank of Money Paid Out to Customer by Mistake (1981) 10 A.L.R.4th 524, §§ 6-7 and cases collected.)

This rule, however, was subject to certain defenses. ■ The most widely acknowledged defense to a claim for restitution for an erroneous transfer of funds was detrimental reliance by an innocent beneficiary. (Rest., Restitution § 142, com. c; 1 Witkin Summary of Cal. Law (9th ed. 1987) Contracts, § 94, pp. 124-125; *Doyle* v. *Matheron* (1957) 148 Cal.App.2d 521, 522 [306 P.2d 913].)

■ A less widely acknowledged defense to a claim for restitution was the "discharge for value" rule. (Rest., Restitution, § 14.) This defense arises where there is a preexisting liquidated debt or lien owed to the beneficiary by the originator of the payment. If the originator or some third party erroneously gives the beneficiary funds at the originator's request, and the beneficiary in good faith believes the funds have been submitted in full or partial payment of that preexisting debt or lien and is unaware of the originator's or third party's mistake, the originator or third party will not be entitled to seek repayment from the beneficiary of the erroneously submitted funds. (1 Witkin (9th ed. 1987) Contracts, §§ 94, 100, 102, pp. 124, 129-130.)

The bank contends California courts have not adopted this rule and therefore it should not be applied in this case. A review of the cases, however, indicates to the contrary. For example, the decision in *Title & Trust Co.* v. *Bank of America etc.* (1936) 12 Cal.App.2d 437 [55 P.2d 533] was specifically referred to in the reporter's notes to the Restatement of Restitution section 14 on the "discharge for value" rule as the basis for illustration six of comment (b). (See Rest., Restitution § 14, rptr.'s notes, p. 11.)[3]

Other California cases have invoked the principle without specifically mentioning the "discharge for value" rule. The decision in *Montgomery* v.

---

[3]After the rightful owner regained possession of a stolen car, mortgagee, who lent money against the car to the thief, was not entitled to reimbursement from an earlier mortgagee whose lien had been paid off with funds from the second mortgagor's loan to the thief. (Rest., Restitution, § 14, com. b, illus. 6.)

*Meyerstein* (1921) 186 Cal. 459 [199 P. 800] is one such example. In that decision the court held a plaintiff who sought to rescind a land sale contract due to fraud was not entitled to seek restitution from preexisting lienholders whose liens had been satisfied out of the sales proceeds and who were unaware of the fraud. (See also *Hilliard* v. *Bank of America* (1951) 102 Cal.App.2d 730 [228 P.2d 327].)

Thus, under existing law the bank was entitled to seek restitution for the overpayment to defendants despite its negligence, unless defendants had detrimentally relied on the additional payment without notice of the mistake or unless the defendants had applied in good faith the additional erroneous payment to a preexisting debt or lien owed to them from Mr. Sanati.

II.  *The Bank Was Entitled to Judgment Even If the Statutory Provisions Governing Erroneous Fund Transfers Controlled.*

On appeal defendants vigorously argue the trial court erred in applying to a fund transfer case the general common law pertaining to commercial paper and negotiable instruments. They argue the court should have applied division 11 of the California Uniform Commercial Code which governs the consequences of an erroneous execution of a payment order. Defendants also suggest that had the court applied the new law, summary judgment would have been inappropriate because there would have been a triable issue of material fact whether defendants believed in good faith the additional erroneous payment was sent in satisfaction or discharge of a preexisting debt or lien from Mr. Sanati.

Defendants' argument fails for two reasons.  First, the trial court did not err in failing to apply the new fund transfer provisions of division 11 of the California Uniform Commercial Code. The Legislature expressly stated that division only applied to fund transfers in which the originator's payment order was transmitted on or after January 1, 1991. (Stats. 1990, ch. 125, § 3.) The payment order in the present case was transmitted in April of 1990. Thus, by its terms the new fund transfer provisions of the California Uniform Commercial Code did not apply to the transfer in this case.

Secondly, even if the new fund transfer provisions were applied to this case, we conclude defendants have failed to create a triable issue of material fact whether Mr. Sanati owed them a preexisting debt or lien even assuming their good faith.

Section 11303 of the California Uniform Commercial Code discusses the effect of an erroneous transfer. That section merely restates existing law governing such errors and provides in pertinent part:

"(a) A receiving bank that (i) executes the payment order of the sender by issuing a payment order in an amount greater than the amount of the sender's order, . . . is entitled to payment of the amount of the sender's order . . . . The bank is entitled to recover from the beneficiary of the erroneous order the excess payment received to the extent allowed by the law governing mistake and restitution."

The comment to the Uniform Commercial Code which was incorporated into the comments in the California Uniform Commercial Code provides examples illustrating how this section should operate. The effect of the comment explicating this section is to expressly adopt the "discharge for value" rule found in section 14 of the Restatement of Restitution.

The relevant comment provides:

"Subsections (a) and (b) deal with cases in which the receiving bank executes by issuing a payment order in the wrong amount. If Originator ordered Originator's Bank to pay $1,000,000 to the account of Beneficiary in Beneficiary's Bank, but Originator's Bank erroneously instructed Beneficiary's Bank to pay $2,000,000 to Beneficiary's account, subsection (a) applies. If Beneficiary's Bank accepts the order of Originator's Bank, Beneficiary's Bank is entitled to receive $2,000,000 from Originator's Bank, but Originator's Bank is entitled to receive only $1,000,000 from Originator. Originator's Bank is entitled to recover the overpayment from Beneficiary to the extent allowed by the law governing mistake and restitution. Originator's Bank would normally have a right to recover the overpayment from Beneficiary, but in unusual cases the law of restitution might allow Beneficiary to keep all or part of the overpayment. For example, if Originator owed $2,000,000 to Beneficiary and Beneficiary received the extra $1,000,000 in good faith in discharge of the debt, Beneficiary may be allowed to keep it. In this case Originator's Bank has paid an obligation of Originator and under the law of restitution, which applies through section 1-103, Originator's Bank would be subrogated to Beneficiary's rights against Originator on the obligation paid by Originator's Bank."[4]

Thus, under this section defendants would be entitled to retain the erroneously sent funds if in good faith they believed the funds were sent to them in satisfaction of or in discharge of a valid preexisting debt or lien.

---

[4]Thus, under both the common law and the new statutory provisions, the money used to effect the transfers, and the money erroneously overpaid to defendants in this case, is deemed to belong to the bank. (*Cooper* v. *Union Bank* (1973) 9 Cal.3d 371, 377 [107 Cal.Rptr. 1, 507 P.2d 609]; *Basch* v. *Bank of America* (1943) 22 Cal.2d 316, 321 [139 P.2d 1].) Thus, the real issue in this case is not whether defendants could properly claim a community property interest in the *bank's* money but whether, and under what circumstances, the defendants could be allowed to retain the bank's money erroneously sent them as a result of the bank's lack of due care.

Toward this end, Fatane Sanati asserted she had a quasi-community property interest in Mr. Sanati's London bank account as well as in all other property accumulated during their marriage. In an affidavit offered in opposition to the bank's motion for summary judgment Mrs. Sanati declared:

"3. I was married to Hassan Sanati, ('husband') . . . on September 7, 1963 in Tehran, Iran where we resided until I came to Los Angeles with our two children.

"4. My husband and I lived with our children, also defendants in this action, in Los Angeles since 1983. My husband was travelling in and out of the United States and until November of 1987, he had collectively spent 22 months in California during that period.

"5. During our marriage we accumulated a substantial amount of money and real property, most of which was located in Iran and England.

"6. My husband has always kept all of the bank accounts and most of the real property, wherever situated, in his own name.

"7. Since he left in November, 1987, my children and I have been receiving interest monthly from our bank account in London, England to our account . . . at Bank of America, Tarzana branch. The account in London was opened by my husband with funds derived from our bank accounts and real property in Iran.

"8. I had asked my husband on numerous occasions to transfer the London account to me in Los Angeles. Although he had agreed to do so on several occasions he had never done it.

"9. My children and I have been virtual prisoners here and completely at my husband's mercy with regard to financial matters. For the last twenty five years, my husband has always exercised complete control over all of our marital community. assets worldwide.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"11. In May, 1990, the Bank of America in London transferred the monthly interest and the entire principal of the account to my and my husband's account in Bank of America in Tarzana.

"12. I used some of these funds for the family and I removed the remainder to accounts under my control.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . .

"17. Since the London account was transferred to our joint account in California, I have spoken to my husband via telephone. On several occasions, he agreed to keep the transferred money in our joint account under both our names. However, to this date, he has not done so.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . .

"19. I have filed a petition for Dissolution of Marriage at the Los Angeles Superior Court on July 2, 1990. . . . The Summons and Complaint were personally served upon my husband, in Tehran, Iran, by Rosy Shahbodaghi, on September 24, 1990. I have instructed my counsel to enter his default therein. . . ."

Thus, Mrs. Sanati's declaration raises a reasonable inference of a potential quasi-community property interest in the funds in the London bank account held in Mr. Sanati's name alone. However, this evidence does not raise a reasonable inference of a preexisting debt or lien at the time of the transfer of the type recognized in those decisions applying the "discharge for value" rule.

For example, in *Banque Worms* v. *Bank America Intern.* (S.D.N.Y. 1989) 726 F.Supp. 940, affirmed (2d Cir. 1991) 928 F.2d 538, the case upon which defendants primarily rely, the debt was a bank loan. In that case the originator had an outstanding loan for $2 million from Banque Worms. On the day before the erroneous transfer, Banque Worms notified the originator it was calling the loan. The next day Banque Worms received a wire transfer for $2 million from Security Pacific International Bank (SPIB), the originator's bank, and applied it to the originator's outstanding loan balance. Shortly thereafter Banque Worms received a second wire transfer from the originator's bank for $1,974,267.97 which was the amount the originator actually requested to be sent. Because it only had instructions for the latter payment, SPIB could not debit the originator's bank account for the first erroneous payment. Because Banque Worms received the payment in the good faith belief it was in response to their demand for repayment of the loan, the court held SPIB had to suffer the loss for the mistaken payment under the "discharge for value" rule.

Examples in the Restatement of Restitution describing the "discharge for value" rule describe debts that are liquidated, concrete and preexisting, not merely probable and undetermined. (E.g., Rest., Restitution, § 14, com. b, illus. 1 [no restitution for proceeds erroneously used to pay existing mortgage on real estate]; illus. 2 [no restitution from city for property taxes paid

on property not actually owned]; illus. 3 [no restitution where bank erroneously cashes customer's check given to payee in payment for services rendered]; illus. 4 [no restitution from judgment creditor for execution of judgment of wrong person's property].) No decision we are aware of has applied the discharge for value rule where the debt or lien in question was anything less than an objectively verifiable, preexisting, liquidated obligation. (See Rest., Restitution (appen.) § 14 and cases collected.) Indeed, allowing the rule to apply to debts or obligations any less substantial would risk destroying the certainty of the rule and allow the exception to control its application.

Consequently, it does not appear the "discharge for value" rule can be properly invoked in a case such as this where the alleged preexisting debt or lien is at best a probable yet undetermined interest in a portion of the funds in Mr. Sanati's bank account in London.[5]

The defendants do not contend they changed their position to their detriment in reliance on the erroneously transmitted funds. Nor do the defendants' opposition papers raise any other potential defense to the bank's action for restitution. ▪ Thus, in the absence of any viable defense, the bank was entitled to restitution from the beneficiaries for the erroneously transmitted funds. We therefore conclude the trial court did not err in finding the bank was entitled to judgment as a matter of law.

## DISPOSITION

The judgment is affirmed. Each side to bear its costs of appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

---

[5]This case would raise entirely different issues if, for example, there was a preexisting judgment dividing the parties' marital assets decreeing a sum certain of $200,000 or more in cash to be transferred to Mrs. Sanati as part of the settlement and that this amount was due and owing to her at the time of the erroneous wire transfer. But those are not the facts of this case. In fact, Mrs. Sanati did not file for dissolution of marriage until several months after the erroneous fund transfer.