**BANCA COMMERCIALE ITALIANA, NEW YORK BRANCH, Plaintiff–Appellant,**

v.

**NORTHERN TRUST INTERNATIONAL BANKING CORPORATION, Defendant–Appellee.**

**Docket No. 97–7633.**

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1997.

Decided Oct. 26, 1998.

---

**91**

Howard C. Buschman, III, Gilmartin, Poster & Shafto (Richard A. Bertocci and Thomas J. Donlon, on the brief), New York, N.Y., for Plaintiff–Appellant.

Richard A. Spehr, Mayer, Brown & Platt (Steven Wolowitz and Catherine C. Jenkins, on the brief), New York, N.Y., for Defendant–Appellee.

Before: WALKER and CABRANES, Circuit Judges.*

\* Circuit Judge Frank X. Altimari voted for the disposition herein, but due to illness was unable to consider this opinion. He died on July 19, 1998. The remaining members of the panel, who are in agreement, have decided this case

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-appellant Banca Commerciale Italiana, New York Branch ("BCI–NY") appeals from the April 30, 1997, judgment of the United States District Court for the Southern District of New York (Loretta A. Preska, *District Judge* ) denying its cross-motion for summary judgment and granting summary judgment in favor of defendant-appellee Northern Trust International Banking Corporation ("Northern Trust") on BCI–NY's claims under Article 4–A of the Uniform Commercial Code and under common law theories of restitution, fraud, and conspiracy seeking the return of funds involved in an electronic funds transfer. *See Banca Commerciale Italianan v. Northern Trust Int'l Banking Corp.,* 1997 WL 217591 (S.D.N.Y. Apr.30, 1997).

## BACKGROUND

On April 23, 1991, the London Branch of Banca Commerciale Italiana ("BCI–London") agreed by telephone to a currency swap with Wallace Smith Trust Co. Ltd. ("Wallace Smith") whereby BCI–London would sell £1,750,000 to Wallace Smith in exchange for $2,968,262.50. BCI–London agreed to send the pounds sterling that day to Wallace Smith's account at Midland Bank, and Wallace Smith agreed to send the dollars to BCI–NY for the account of BCI–London. BCI–London sent the £1,750,000 to Midland Bank by 9:06 a.m.[1] Wallace Smith then issued instructions to Northern Trust to pay $2,968,262.50 to BCI–NY for the account of BCI–London.

Northern Trust issued a payment order to BCI–NY for the benefit of BCI–London in the requisite amount through the New York Clearing House Interbank Payments System ("CHIPS"). That order hit BCI–NY's CHIPS computer at 12:50:42 p.m., and was posted to the account of BCI–London by 3:16:44 p.m.

and issued this opinion pursuant to Second Circuit Local Rule § 0.14. *See United States v. Desimone,* 140 F.3d 457 (2d Cir.1998).

1. All hours are New York time.

That same day, apparently after Northern Trust's payment order had been sent to BCI–NY, Wallace Smith telephoned Northern Trust to cancel the payment to BCI–NY for the account of BCI–London and at 4:17 p.m. confirmed that instruction by telex. This act set off a sequence of events that is at the heart of this dispute over who should bear the loss of the nearly $3 million at issue. Northern Trust called BCI–NY and followed up with a telex sent at 5:02 p.m., requesting that BCI–NY "refund the amount of USD2,968,262.50 which was not intended for you." In the same telex, Northern Trust gave its guarantee that "in consideration of your complying with the terms of this indemnity we agree to indemnify you according to the Compensation Indemnity and Responses contained in the Council on International Banking[']s Guideline For Issuing and Responding to an Indemnity."

CHIPS transactions on the day in question settled at 5:21 p.m. At 5:48 p.m. the same day, BCI–NY returned $2,968,262.50 to Northern Trust via Fedwire[2] wire transfer. Northern Trust credited the returned amount to the account of Wallace Smith.

Two days later, on April 25, 1991, in accordance with the rules of the Council on International Banking ("CIB"), Northern Trust asked that BCI–NY "release [it] from [its] guarantee as funds were returned sameday [sic] via your [Fedwire]." Although BCI–NY had not contacted BCI–London to obtain its debit authorization, on August 29, 1991 BCI–NY sent Northern Trust a transmission that read: "re YR TLX. GTY DD 4 23 91.... We hereby consider YR GTY as null and void as funds were refunded same day via our Fed [wire]." In an affidavit submitted to the district court, Rene Seghini, the head of the Investigations Department of BCI–NY, admitted that he

> sent the message [to Northern Trust] ... because my department made an error.... My department verified our return of the funds and simply assumed, without checking, that the request from Northern Trust had come early enough

in the day for operations to have called BCI London and procured their consent to the return.

BCI–London apparently did not consent to the return of funds because BCI–NY alleges that it was later required to "re-credit[ ] to BCI London the amount of $2,968,262.50 upon demand of BCI London."

Within two weeks of Northern Trust's request for the return of funds, Wallace Smith's operations were suspended by the Bank of England, and insolvency proceedings ensued. In the wake of Wallace Smith's demise, its principal was imprisoned for six years for a £100 million fraud.

BCI–NY filed this action on December 18, 1995, asserting claims under Article 4–A of New York's Uniform Commercial Code, as well as common law theories of unjust enrichment, fraud, and conspiracy. The underlying premise of BCI–NY's claims is that Northern Trust wrongfully induced a return of the funds by misrepresenting that it sought the return because of a bank error, rather than a late-received stop payment from Wallace Smith, which, BCI–NY asserts, constitutes an improper basis for seeking a return of funds that have already been credited to the beneficiary's account. Northern Trust moved to dismiss, or in the alternative for summary judgment. BCI–NY cross-moved, seeking summary judgment on its claims for unjust enrichment and pursuant to Article 4–A. The district court granted summary judgment to Northern Trust and dismissed BCI–NY's claims. BCI–NY now appeals.

## DISCUSSION

In its opinion, the district court held that the "null and void" telex from BCI–NY constituted a general release of its claims and that even if there had been no general release, all of BCI–NY's claims failed: the Article 4–A claim was time-barred; BCI–NY could not prove either material misrepresentation or reasonable reliance required for fraud; there was no unjust enrichment be-

<hr>

**2.** Fedwire "is a fund-transfer system owned and operated by the [United States] Federal Reserve Banks. It is used primarily for the transmission

and settlement of payment orders." *Organizacion JD LTDA. v. Department of Justice*, 124 F.3d 354, 356 n. 3 (2d Cir.1997).

cause Northern Trust had not acted improperly; and New York does not recognize a cause of action for civil conspiracy.

On appeal, BCI–NY argues that the district court erred (1) in finding that the statutory liability imposed by UCC Article 4–A is governed by a three-year statute of limitations; (2) in finding that BCI–NY could not prove the element of material misrepresentation in its claim of fraud against Northern Trust; (3) in finding that BCI–NY could not prove unjust enrichment; and (4) in holding that BCI–NY's telex stating that it considered Northern Trust's guarantee "null and void" constituted a general release. For the following reasons, we affirm the district court's grant of summary judgment in favor of Northern Trust.

### I.  Standard of Review

We review the district court's grant of summary judgment *de novo,* drawing all reasonable inferences and resolving all ambiguities in favor of the non-movant. *See Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112–13 (2d Cir.1992); *Taggart v. Time Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). Summary judgment is appropriate if the evidence offered, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, there "is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. When a defendant moving for summary judgment has pointed to the absence of evidence to support an essential element on which the plaintiff has the burden of proof, the plaintiff, in order to avoid summary judgment, must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial. *See Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

### II.  The Article 4–A Claim

Article 4–A of New York's Uniform Commercial Code governs the rights and liabilities of parties involved in commercial electronic funds transfers. BCI–NY's Article 4–A claim was brought pursuant to § 211(6), which provides:

> Unless otherwise provided in an agreement of the parties or in a funds-transfer system rule, if the receiving bank, after accepting a payment order, agrees to cancellation or amendment of the order by the sender or is bound by a funds-transfer system rule allowing cancellation or amendment without the bank's agreement, the sender, whether or not cancellation or amendment is effective, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation or amendment or attempted cancellation or amendment.

N.Y.U.C.C. § 4–A–211(6). Northern Trust argues that this section does not apply to the transaction at issue because it was governed by the CIB Rules, a "funds-transfer system rule". We need not address this argument, however, because we agree with the district court's conclusion that BCI–NY's Article 4–A claims were time-barred.

The statute itself does not provide an express statute of limitations for claims brought pursuant to its terms. The district court adopted Northern Trust's contention that New York CPLR § 214(2), which provides a three-year statute of limitations for "an action to recover upon a liability, penalty, or forfeiture created or imposed by statute," applied to BCI–NY's Article 4–A claim. If so, BCI–NY's claim was time-barred as of April 23, 1994, almost 20 months before this action was filed.

BCI–NY counters that the liability it seeks to impose on Northern Trust under Article 4–A has a common law antecedent, and, therefore, is not one "created or imposed by statute." Instead, BCI–NY contends, its claim is governed by CPLR § 213(1), which provides a six-year statute of limitations for

actions "for which no limitation is specifically prescribed by law."

For a claim to fall within the confines of CPLR § 214(2), the statute must impose a liability " 'for wrongs not recognized in the common or decisional law.' " *State v. Stewart's Ice Cream Co.*, 64 N.Y.2d 83, 88, 484 N.Y.S.2d 810, 473 N.E.2d 1184 (1984) (quoting *State v. Cortelle Corp.*, 38 N.Y.2d 83, 86, 378 N.Y.S.2d 654, 341 N.E.2d 223 (1975)). The New York Court of Appeals has "consistently held that [CPLR § 214(2)] ... only governs liabilities which would not exist but for a statute. It does not apply to liabilities existing at common law which have been recognized by statute. Thus, if the [statute imposing liability] merely codifies or implements an existing liability, the three-year statute would be inapplicable." *Aetna Life & Casualty Co. v. Nelson*, 67 N.Y.2d 169, 501 N.Y.S.2d 313, 315, 492 N.E.2d 386 (1986) (citations omitted). Section 211(6), quoted above, departs from the common law: it imposes absolute liability on the sender of an electronic funds transfer to the receiving bank if the sender cancels a payment order that has already been accepted, even though the receiving bank has freely agreed to the cancellation. It does not require any showing of the elements required to establish common law fraud or unjust enrichment. In particular, § 211(6) does not require any showing of wrongfulness on the part of the sender.

BCI–NY points to *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991), and *General Elec. Capital Corp. v. Central Bank*, 49 F.3d 280 (7th Cir.1995), for the proposition that it could have brought a common law claim under the "discharge for value" rule. Under this rule,

> "[a] creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake."

*Banque Worms*, 77 N.Y.2d at 367, 568 N.Y.S.2d 541, 570 N.E.2d 189 (quoting Restatement of Restitution § 14(1)). We find BCI–NY's argument unpersuasive.

In *Banque Worms*, the New York Court of Appeals applied the "discharge for value" rule to allow the recipient of a mistakenly sent payment order to retain the funds in discharge of a debt already owed the recipient by the sender. Although the case was decided barely a month after Article 4–A had become effective and did not apply Article 4–A retroactively, the court relied heavily on Article 4–A's purposes and goals in reaching its decision; specifically, the court found that the "discharge for value" rule was consistent with Article 4–A. *Id.* at 373, 568 N.Y.S.2d 541, 570 N.E.2d 189. Significantly, however, the court applied the "discharge for value" rule as a defense to the sender's claim that it was entitled to recover the funds because they were sent in error. There is no indication in the opinion that the "discharge for value" rule would support a cause of action by itself, were the recipient to voluntarily return the funds to the sender and then bring suit for their return.

*General Electric* also involved a funds transfer mistakenly sent to a recipient who was already owed a debt by the sender. As in the instant case, the recipient's bank, at the sending bank's request, returned the funds to the sender and debited the funds from the recipient's account without the recipient's consent. The recipient brought a claim against its bank for conversion arguing that it would have been entitled to retain the funds under the "discharge for value" rule. The court agreed and required the recipient's bank to return the funds. Here, BCI–NY could not have maintained an action for conversion, which requires a showing "that the defendant exercised an unauthorized dominion over that property, ... to the exclusion of the plaintiff's rights," because it voluntarily returned the funds to Northern Trust and Northern Trust issued it a full indemnification. *Middle East Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir.1987) (internal quotation marks omitted) (alterations in original) (noting that issuance of full indemnification defeated claim for conver-

sion). BCI–NY makes much of the *General Electric* court's observation that, upon returning the funds to the recipient, the recipient's bank would be subrogated to the recipient's rights. *See* 49 F.3d at 286. However, the court was referring to the recipient's rights under the original agreement (i.e., against Wallace Smith in this case), not against the sending bank based on the electronic funds transfer (i.e., in this case Northern Trust). In fact, the court specifically noted that the recipient's bank's failure to request an indemnity prevented it from recovering from the sending bank. *Id.*

BCI–NY does not identify any other common law action which could be said to be antecedent to the liability imposed by § 211(6). Indeed, it is widely recognized that Article 4–A was enacted to correct the perceived inadequacy of " 'attempt[ing] to define rights and obligations in funds transfers by general principles [of common law] or by analogy to rights and obligations in negotiable instruments law or the law of check collection.' " *Banque Worms*, 77 N.Y.2d at 369, 568 N.Y.S.2d 541, 570 N.E.2d 189 (quoting Official Comment to N.Y.U.C.C. § 4–A–102); *see also Centre–Point Merchant Bank Ltd. v. American Express Bank Ltd.*, 913 F.Supp. 202, 206 (S.D.N.Y.1996) ("The rulemakers also labored to write a detailed statute that would allocate risks among the various parties to such transactions in light of competing interests."). The Official Comment to Article 4–A states that the drafters made "a deliberate decision . . . to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." N.Y.U.C.C. § 4–A–102, cmt. This lends powerful support to the application of CPLR § 214(2) to claims brought under Article 4–A.

Finally, any lingering doubts we might have about imposing a three-year statute of limitations are removed by the New York Court of Appeals' observation in *Banque Worms* that "[e]stablishing *finality* in electronic fund wire transactions was considered a singularly important policy goal" to be served by Article 4–A. 77 N.Y.2d at 372, 568 N.Y.S.2d 541, 570 N.E.2d 189 (emphasis added). This goal is better served by requiring claimants to assert their claims concerning electronic funds transfers within a limitations period of three years rather than six years. Accordingly, we affirm the district court's holding that BCI–NY's Article 4–A claims were time-barred.

### III. The Common Law Claims

The district court held both (1) that BCI–NY could not establish its common law claims for fraud and unjust enrichment and (2) that, in any event, BCI–NY had released these claims (along with its claim brought pursuant to Article 4–A of the U.C.C.) in its August 29, 1991 transmission. Because we agree that BCI–NY released its common law claims, we need not consider whether a dispute of material fact would otherwise preclude summary judgment for Northern Trust.

### IV. Release

■ Even assuming, as BCI–NY argues, that unresolved questions of fact remain as to BCI–NY's fraud and unjust enrichment claims, Northern Trust is nevertheless entitled to summary judgment on these common law claims because BCI–NY released them.[3] BCI–NY informed Northern Trust that it "consider[ed Northern Trust's] guaranty as null and void" two days after returning the funds to Northern Trust. The district court interpreted this communication as a general release of BCI–NY's common law claims. We agree.

BCI–NY's first two arguments are that the communication, which does not use the word "release," was not intended as a release, or at any rate, is too ambiguous to be interpreted as a release. These arguments are without merit.

As we discussed above, Northern Trust invoked the CIB Rules in its 5:02 p.m. telex

---

**3.** The question of whether the release of the indemnification would have also released BCI–NY's claim under Article 4–A raises subsidiary issues not adequately briefed by the parties. Because resolution of this question is not essential to the disposition of this case, we do not address it.

of April 23, 1991, which requested repayment and stated that "in consideration of your complying with the terms of this indemnity we agree to indemnify you according to [the CIB Rules]." As BCI–NY acknowledges, the CIB Rules did not obligate it to return the funds to Northern Trust. However, the CIB Rules provided that upon accepting Northern Trust's offer of indemnity, BCI–NY "agree[d] to contact [BCI–London] immediately to obtain its debit authorization. Upon receiving such debit authorization, [Northern Trust's] obligations under this Indemnity will cease and [BCI–NY] will notify [Northern Trust] of [its] release hereunder." Thus, as the district court noted, this agreement, as mandated by the CIB Rules, placed squarely on BCI–NY the obligation to contact BCI–London prior to releasing Northern Trust's guarantee.

As Mr. Seghini of BCI–NY admitted, when BCI–NY received the request for a release from Northern Trust, he mistakenly assumed that debit authorization had already been obtained from BCI–London. Although Mr. Seghini contends that he consciously did not intend to give a release, but merely wanted to inform Northern Trust that BCI–NY was no longer relying on the indemnity, we are hard-pressed to find an alternative interpretation of BCI–NY's telex other then that it constituted a release. BCI–NY has offered no reason for why it would not have given a release when it believed BCI–London had already consented (which, if true, would have *obligated* BCI–NY to give a release under the CIB Rules). Second, BCI–NY offers no alternative interpretation for the words it did use: your guaranty is null and void. Instead it says "the words mean just what they say." To us, these words mean that Northern Trust was released from its indemnity.

■ Next, BCI–NY renews its argument from below that the release should be invalidated on the ground of unilateral mistake— namely, BCI–NY's mistaken belief that BCI–London had consented to the return of funds. The *Middle East* court rejected this same argument based on the fact that there was no evidence that the sending bank in that case knew or had reason to know that the release had been sent in error, i.e., without the beneficiary's debit authorization. *See* 821 F.2d at 906. The same reasoning applies here. We also agree with the district court that none of the cases cited by BCI–NY stands for the proposition that in the time since *Middle East* was decided, the New York courts have adopted a doctrine of unilateral mistake that does not require that the mistake is "one which is known or ought to have been known to the other party." *Id. See, e.g., Gould v. Board of Educ.*, 81 N.Y.2d 446, 599 N.Y.S.2d 787, 616 N.E.2d 142 (1993) (applying doctrine of mutual mistake to rescission of contract).

Finally, BCI argues that even if its communication to Northern Trust was a release, the release was limited to Northern Trust's indemnification and did not constitute a general release of its common law claims. *Middle East* is instructive on this point. There the court held that because the indemnity was absolute, the release was also absolute, on the ground that the " 'release of the guarantee is considered equally as encompassing as the guarantee itself,' " 821 F.2d at 908 (quoting expert testimony), as well as the fact that the "burden is on the releasor to establish that the release should be limited," *id.* at 907. Although in other contexts we might hesitate to adopt such a broad rule, in the peculiar context of electronic funds transfers, where hundreds of billions of dollars are transferred daily via hundreds of thousands of electronic funds transfers, *see Banque Worms*, 77 N.Y.2d at 369–70, 568 N.Y.S.2d 541, 570 N.E.2d 189 (discussing volume, costs, and efficiency of electronic funds transfers); *Middle East*, 821 F.2d at 900 n. 1 (same), the need for certainty with respect to such unnegotiated interbank communications is paramount.

Accordingly, we agree with the *Middle East* court that the release should ordinarily be considered to be as broad as the indemnity and that the burden is on the releasor to establish that the release is more limited. In the present case, BCI–NY failed to meet its burden of establishing that the release was limited. The indemnity issued by Northern Trust provided that BCI–NY would be indemnified "against any and all claims, liabilities, losses, [and] expenses." Northern Trust then expressly requested to be re-

leased on its indemnity. The communication sent in response to this request did not indicate any limitations or qualifications, but simply stated that BCI–NY considered Northern Trust's indemnity to be "null and void." In the absence of any qualifications, BCI–NY should reasonably have expected Northern Trust to rely on BCI–NY's statement, by, for example, releasing the funds back to Wallace Smith. We therefore affirm the district court's holding that the communication sent by BCI–NY was as broad as the indemnity issued by Northern Trust. Because the indemnity applied to all claims, BCI–NY's communication constituted a general release barring BCI–NY's common law claims.

## CONCLUSION

We hold that (1) claims brought under Article 4–A of New York's Uniform Commercial Code are governed by CPLR § 214(2)'s three-year statute of limitations, and, thus, BCI–NY's claim under Article 4–A is time-barred; and (2) BCI–NY's common law claims fail because its telex to Northern Trust stating that it considered Northern Trust's indemnification "null and void" constituted a general release of its claims.

For the reasons set forth above we affirm the district court's grant of summary judgment in favor of Northern Trust.