### GENERAL ELECTRIC CAPITAL CORPORATION, Plaintiff–Appellant,

v.

### CENTRAL BANK, Defendant–Appellee.

### No. 93–2951.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1994.

Reargued Sept. 12, 1994.

Decided Feb. 22, 1995.

Rehearing and Suggestion of Rehearing En Banc Denied April 10, 1995.

Bruce A. McIlnay (argued) and Mark S. Schmitt, Miller, Simon & Maier, Milwaukee, WI, for plaintiff-appellant.

Eugene A. Kershek (argued) and Mark E. Kershek, Kershek & Kershek, Milwaukee, WI, for defendant-appellee.

Before LAY,* EASTERBROOK, and KANNE, Circuit Judges.**

EASTERBROOK, Circuit Judge.

Duchow's Marine, Inc., financed its inventory of boats with a loan from General Electric Capital Corporation (GECC), which took a security interest in the boats and the proceeds from their sale. The security interest was perfected under Wisconsin law. Duchow's Marine and its owner Roger Duchow (collectively Duchow) promised to deposit proceeds into an account from which they could be disbursed only on GECC's signature. The name on this account at Central Bank was "Duchow Marine, Inc. GE Escrow Account." Following the parties' convention, we call this the blocked account. Duchow maintained a separate account at Central Bank for revenues from other sources; we call this the regular account. In November 1990 Duchow sold a yacht to Gray Eagle, Inc., and directed the customer to remit $215,370 of the purchase price to the regular account. By issuing this instruction Duchow set out to defraud GECC.

Gray Eagle instructed its bank to make a wire transfer, giving it the number of Duchow's regular account. Gray Eagle's bank, which we call the "originator's bank" following the convention of the Uniform Commercial Code's new Article 4A, asked Banker's Bank of Madison, Wisconsin, to make the transfer on its behalf. The originator's bank performed correctly. As an intermediary bank, Banker's Bank should have relayed the payment order exactly. It didn't. Banker's Bank made the transfer by crediting Central Bank's account at Banker's Bank, but it bobtailed the instructions. Banker's Bank told Central Bank (which the UCC calls the "beneficiary's bank") that the credit was for Duchow's benefit. That's all; the payment order omitted account identification. A clerk at Central Bank routed the funds to the first account she found bearing Duchow's name: the blocked account. This credit was made on November 23, 1990. Entirely by chance, Duchow's fraudulent scheme had been foiled.

But not for long. Duchow, thinking the funds were in the regular account, promptly wrote a check in an effort to spirit them away. The check appeared on the overdrawn-accounts list of November 29. When contacted, Roger Duchow asserted that the money belonged in the regular account. Central Bank inquired of Banker's Bank, which on November 30 relayed the full payment order, including the number of Duchow's regular account. Without notifying GECC, Central Bank then reversed the credit to the blocked account, credited Duchow's regular account, and paid the check. When it discovered what had happened, GECC filed this diversity action seeking to hold Central Bank liable for conversion of its funds. Central Bank impleaded Duchow, but no one believes that he or his firm is good for the money; Duchow has not participated in this case. The parties agree that Wisconsin supplies the applicable law.

That the money removed from the blocked account belonged to GECC there can be no doubt. UCC § 9–306. Central Bank does not deny that GECC has established the ordinary elements of conversion so much as it asserts a bankers' privilege: a beneficiary's bank following the payment order of an intermediary bank in a funds transfer should be free from liability, Central Bank insists. We may assume that this is so if the beneficiary's bank follows the original payment order. GECC does not contend that it could recover from any of the three banks (originator's, intermediary, or beneficiary's) if all three had slavishly followed a set of instructions that Gray Eagle gave its bank, even though Duchow devised these instructions to cheat GECC. Central Bank could not be thought to "convert" funds over which it never had a right of control. Cf. *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988).

Once the funds landed in the blocked account, however, Central Bank had to make a nonclerical decision. Must it move them? *Could* it move them? By accepting the payment order, Central Bank incurred an obli-

* Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

** After the original argument, Judges Cudahy and Rovner recused themselves. Replacements were drawn and the case was reargued.

gation to credit the funds to Duchow. As it had done exactly that, crediting an account where they discharged one of Duchow's debts, Duchow had no legitimate complaint—certainly not given GECC's security interest in the proceeds. No rule of law obliged Central Bank to change the credit. Banker's Bank fouled up and may have been liable to Gray Eagle; Central Bank was in the clear. See UCC §§ 4A–207(b)(2), 4A–305(b)(iii); Wis. Stat. §§ 410.207(2), 410.305(2).[†] Seven days had passed, and credits in the banking system often become irrevocable in less time. Think of the "midnight deadline" for checks under UCC § 4–301(a); see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank,* 832 F.2d 1005 (7th Cir.1987); cf. UCC § 4–215. Removing funds from an account bearing the title "escrow" calls for the exercise of considered discretion.

Some alterations in credits to accounts are essentially risk-free no matter what the rules of banking law say. If Central Bank had credited the account of, say, John Q. Public with the $215,000 it could have reversed the credit a week later without any risk, for Mr. Public, lacking any legal interest in the funds, could not have cried conversion or sought restitution. The bank does not need a customer's consent to make the transfer; erroneous credits are reversed every day without anyone supposing that an accidental recipient, with no interest in the funds, must be consulted. GECC's reminder that its signature was required for transactions in the blocked account is irrelevant; we deal not with a "withdrawal" but with the calculation of the proper credit. If Central Bank had credited the Duchow–GECC blocked account with $500,000 meant for Acme Widget Corp., the bank could have reversed the bookkeeping blunder without GECC's consent. UCC § 4A–207. Things are dicier when the bank credits the account of someone who has a legitimate claim to the funds. If GECC had

withdrawn the money on the fifth day, Central Bank could not have compelled it to make restitution, because GECC's security interest gave it the legal right to the funds. (We have more to say later on the subject of restitution.) If GECC's interest is strong enough to resist a suit for restitution if it gets to the money first, is it not strong enough to support a suit for conversion if the bank drains the account?

During 1990, when the events of this case took place, the right way to approach the last question we have posed was obscure. Article 4 of the UCC concentrated on checks; courts in some states extended its provisions by analogy to wire transfers, but analogies are always imperfect—and Wisconsin's courts had not had an occasion to engage the subject at all. Some aspects of the process are governed by the federal Electronic Fund Transfer Act, 15 U.S.C. §§ 1693–1693r; others come within the ambit of Regulation J issued by the Federal Reserve or the rules adopted by the New York Clearing House Interbank Payments System (CHIPS). Transfers such as the one we consider that did not use the Fedwire or CHIPS fell into a legal limbo. Recognizing the shortcomings of Article 4 and the pastiche of ancillary rules, the American Law Institute and National Conference of Commissioners on Uniform State Laws had been drafting a wire transfer code for more than a decade. Their solution, the new Article 4A, was enacted in Wisconsin in 1991, after these events. Yet because the highest court of New York has used the provisions of Article 4A to illuminate the law preceding its enactment, see *Banque Worms v. BankAmerica International,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991), the parties agree that the Supreme Court of Wisconsin would do likewise. We accept this understanding and turn to Article 4A. It soon becomes clear why the parties are so willing to have us

---

[†] Wisconsin has codified Article 4A in Chapter 410 of its statutes. This produces the form "Wis.Stat. 410.xxx", where xxx = the designation in the UCC's 1990 Official Text. We omit other Wis. Stat. citations, which the reader can reconstruct. Except for capitalization and internal numbering system, the text enacted in Wisconsin is identical to the Official Text approved by the National Conference of Commissioners on Uniform State Laws and the American Law Institute. Where the Official Text refers to § 4A–302(a), for example, the Wisconsin text refers to s. 410.302(1). Because the UCC is in force nationwide, we use the formal conventions of the Official Text. We explain below why we cite and discuss a statute that was enacted in Wisconsin after the events that led to this case.

apply a subsequently enacted statute to their transaction: Article 4A points us back to the common law of restitution.

The first question is whether the bungle at Banker's Bank produced an order that Central Bank could accept and act on—for if not the money that found its way to the blocked account belonged to Central Bank rather than GECC. The answer is "yes." Section 4A–207(b)(2) provides that if the payment order received by the beneficiary's bank identifies a beneficiary both by name and by account number, and these designations are inconsistent, then:

> If the beneficiary's bank pays the person identified by name ... no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

So if the payment order from Banker's Bank had included Duchow's name without further elaboration, and the number of the regular account, Central Bank still could have "accepted" the payment order by making a credit to the blocked account—for that account too is identified by Duchow's name, and GECC "was entitled to receive payment from the originator of the funds transfer." The omission of the regular account's number does not make credit to the blocked account less acceptable.

Whether a credit properly made after acceptance by the beneficiary's bank may be reversed is a subject addressed almost in passing by § 4A–303, which principally concerns a receiving bank's obligation, to the sender, to execute the payment order. (A "receiving bank" is the originator's bank and any intermediary bank that executes a payment order; a beneficiary's bank can "accept" but not "execute" a payment order. UCC §§ 4A–103(a)(4), 4A–301(a) and Official Comment 1.) Section 4A–303(c) provides:

> If a receiving bank executes the payment order of the sender by issuing a payment order to a beneficiary different from the beneficiary of the sender's order and the funds transfer is completed on the basis of that error, the sender of the payment order that was erroneously executed and all previous senders in the funds transfer are not obliged to pay the payment orders they issued. The issuer of the erroneous order is entitled to recover from the beneficiary of the order the payment received to the extent allowed by the law governing mistake and restitution.

Banker's Bank, a "receiving bank" in this terminology, issued to Central Bank a payment order that was at least arguably "to a beneficiary different from the beneficiary of the sender's order". Central Bank completed the transfer under § 4A–207(b)(2) by crediting the blocked account. The issuer (that is, Banker's Bank) could "recover from the beneficiary of the order" (that is, Duchow and GECC to the extent of each one's interest in the blocked account) "the payment received to the extent allowed by the law governing mistake and restitution." By issuing a revised payment order with the number of Duchow's regular account, Banker's Bank attempted to recoup from GECC and make the funds available to Duchow personally. The question is whether "the law governing mistake and restitution" permitted that step. If it did, Central Bank is off the hook without needing its own shelter in Article 4A. If it did not, Central Bank is liable for conversion. See also UCC § 1–103 (preserving the common law for situations not specifically addressed in the UCC).

Official Comment 2 to § 4A–303 traces out the statute's implications for the case of a mistakenly large payment order ($2 million, when the originator wanted to send only $1 million):

> Originator's Bank would normally have a right to recover the overpayment from Beneficiary, but in unusual cases the law of restitution might allow Beneficiary to keep all or part of the overpayment. For example, if Originator owed $2,000,000 to Beneficiary and Beneficiary received the extra $1,000,000 in good faith in discharge of the debt, Beneficiary may be allowed to keep it. In this case Originator's Bank has paid an obligation of Originator and under the law of restitution, which applies through Section 1–103, Originator's Bank would be subrogated to Beneficiary's rights against

Originator on the obligation paid by Originator's Bank.

*Banque Worms*—the first case decided by any state or federal court arising out of a mistaken payment order under Article 4A, and one of a handful to date—illustrates how the system works in practice. Spedley Securities instructed Security Pacific Bank to make a wire transfer of approximately $2 million to BankAmerica International for the benefit of Banque Worms, to which Spedley was indebted. Security Pacific waited for Spedley to muster the funds to cover the transfer. Before Spedley had assembled the entire $2 million, it instructed Security Pacific to make the transfer to National Westminster Bank rather than to BankAmerica. As the result of a bookkeeping error, Security Pacific made both transfers. It asked BankAmerica to reverse the erroneous credit to Banque Worms; after being given an indemnity BankAmerica did so, but Banque Worms protested, contending that it was entitled to payment on the antecedent debt. Soon Spedley entered insolvency proceedings in Australia, leaving Banque Worms and Security Pacific to contest the entitlement under the law of restitution, with the winner to get $2 million in cash and the loser to become Spedley's creditor in bankruptcy.

New York's Court of Appeals concluded that Banque Worms was entitled to the money. It was the beneficiary of a payment order that Security Pacific had issued and BankAmerica had accepted. Just as Central Bank does, Security Pacific argued that the error leading to the credit was sufficient justification for reversing the transaction unless Banque Worms had relied on the credit to its detriment (which it had not). Rejecting this position, the Court of Appeals followed the "discharge for value" rule in § 14(1) of the ALI's *Restatement of Restitution* (1937). Section 14(1) reads:

A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

The discharge for value rule fit *Banque Worms* perfectly—and it fits our case as well. Banque Worms was Spedley's creditor; that Security Pacific made the payment by error did not oblige Banque Worms to disgorge. GECC not only was Duchow's creditor but also, by virtue of the security interest, held a lien on the proceeds. Neither Banque Worms nor GECC made a misrepresentation; neither had notice of the transferor's mistake. Although § 14 was devised for slow-moving paper transactions, the Court of Appeals thought it an apt rule for speedy wire transfers too, largely because it promotes finality in commercial transactions. Wire transfers permit recipients to draw on funds immediately, and the velocity with which funds turn over can be considerable. Exposing creditors who thought that their debts had been paid off to a lengthy period of uncertainty during which they might be required to reverse the transfer would be the equivalent of pouring molasses on the payments system. The recipient could not tell what its outstanding obligations were and would have to exercise undue caution. As the Court of Appeals saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds. Costs of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries.

GECC asked the district court to follow *Banque Worms*. The court declined and entered judgment for Central Bank after concluding that Wisconsin does not employ the discharge for value rule. The court wrote: "Wisconsin, unlike New York, adheres to the 'mistake of fact' doctrine of restitution. Under this doctrine, money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in position of the other party that it would be unjust to require him to refund." (Footnote omitted.) As it happens, however, New York also embraces this approach as the norm. *Banque Worms*, 568 N.Y.S.2d at 543–44, 570 N.E.2d at 191–92.

It treats the discharge for value rule as an exception to its ordinary approach. So does California. See *Bank of America National Trust and Sav. Ass'n v. Sanati*, 11 Cal.App. 4th 1079, 14 Cal.Rptr.2d 615, 618 (2d Dist. 1992). Does Wisconsin do likewise? The Supreme Court of Wisconsin has never mentioned the discharge for value rule favorably or unfavorably, and it has never cited § 14 of the *Restatement of Restitution*. The omission is not surprising; mistaken payments that just happen to land in the pockets of the true owner are not common. We need to know how Wisconsin would handle the rare case when it arrives.

One of Wisconsin's options is to follow New York in order to promote national uniformity in the treatment of funds transfers. Wisconsin enacted Article 4A of the UCC for this very reason; we would be surprised if that state's courts decided to go it alone on ancillary issues such as the law of restitution. The *Restatement of Restitution* offers a national standard for the common law parallel to the national statutory benchmark of the UCC. When adopting § 14 as the law of New York that state's Court of Appeals remarked that "[n]ational uniformity in the treatment of electronic funds transfers is an important goal". 568 N.Y.S.2d at 547, 570 N.E.2d at 195. Indeed it is. Funds transfers cross state and national borders, and, because New York is the nation's (and the world's) largest financial center, many transfers go through banks in New York. Uniform, known law governing these transactions (and promoting finality in payments, as the discharge for value rule does) enables banks to tailor their practices accordingly, and it produces lower costs for all customers. Wisconsin's businesses share that benefit of uniformity. Variability does not impose costs *on banks;* once they learn the risks, they adjust prices accordingly. Competition among financial intermediaries passes those expenses to customers. Uncertainty serves no one's interests. So our question is not whether Wisconsin *might* blaze a lonely path, but whether it has already done so. It hasn't.

The district court cited only one Wisconsin case: *Amalgamated Ass'n of Street Electric Ry. and Motor Coach Employees v. Danielson*, 24 Wis.2d 33, 128 N.W.2d 9 (1964) (Fairchild, J.). That opinion recites the mistake-of-fact approach and approves a detrimental-reliance qualification. It does not mention, let alone disparage, a potential discharge-for-value qualification. In *Danielson* a labor union that had promised a death benefit to survivors of its members paid twice after a member's death; the discharge for value rule would not have allowed the survivor to keep the second payment, and just about any rule of restitution lets the union recover the second payment, as the court in *Danielson* did. We have found the varying applications of the mistake-of-fact doctrine in Wisconsin hard to reconcile and have wondered whether that doctrine represents Wisconsin's current approach. *Harnischfeger Corp. v. Harbor Insurance Co.*, 927 F.2d 974, 978–79 (7th Cir.1991). To be more precise, what has puzzled us is the mistake-of-law corollary to Wisconsin's doctrine: that payments made under a mistaken understanding of the law may not be recovered even if the recipient has no proper claim to the money. No matter; a mistake-of-fact rule of the sort used in *Danielson* is simply beside the point when the recipient is entitled to the money.

Indeed, *Danielson* implies that Wisconsin is prepared to accept the discharge for value approach when the need arises. The opinion states the rule this way: "a payment made under a mistake of fact caused by forgetfulness may be recovered, where the person to whom the payment is made is not entitled thereto and cannot in good conscience retain it." 24 Wis.2d at 36, 128 N.W.2d at 11. Wisconsin's cases bristle with references to "equity and good conscience." Language such as this passage in *Danielson* suggests that judicial consciences in Wisconsin would not be troubled by permitting persons entitled to money to keep it. See *Ramsey v. Ellis*, 168 Wis.2d 779, 785, 484 N.W.2d 331, 333 (1992) (explaining that "recovery for unjust enrichment is based upon the inequity of allowing the defendant to retain a benefit without paying for it"); *Gross Common Carrier v. Quick–N–Clean Corp.*, 26 Wis.2d 288, 132 N.W.2d 576 (1965) (Fairchild, J.). Illustration 3 to the *Restatement's* § 14 is a no-funds check. "A presents a check payable to

him and for which he has paid value, drawn by B on the C bank. The bank, erroneously believing that B has sufficient funds to his credit, pays the amount of the check to A who has no notice as to the insufficiency of funds. C is not entitled to restitution from A." It is hard to believe that Wisconsin would come to a different conclusion—or that having accepted this principle Wisconsin would nonetheless repudiate the main theme of § 14. We believe that Wisconsin would adopt the discharge for value rule of § 14, and therefore that it would follow *Banque Worms.*

On reading this conclusion, the president of Central Bank may be tempted to tear out his hair in exasperation. In exchange for the few dollars it collects for a wire transfer, how can the Bank have accepted such a risk?, he may well wonder. Duchow perpetrated a fraud, and Banker's Bank bungled the payment order. Details of the law of restitution to one side, why *ought* this lead to liability for the beneficiary's bank, which did not know the source of the funds or GECC's security interest in them? Requiring receiving banks to inquire into the source of the funds or to research financing statements in public records would raise the costs of funds transfers and slow down a mechanism that is designed to allow the movement of huge sums within minutes. The answer is that it ought not lead to liability for the beneficiary's bank—and it would not have left Central Bank holding the bag had it taken precautions after learning of the error. Before reversing the credit in response to Duchow's request, Central Bank could have sought an indemnity agreement from Banker's Bank, and perhaps from Duchow as well. This is what happened in *Banque Worms,* where a chain of indemnities brought the costs of the error home to the responsible party. 568 N.Y.S.2d at 543, 570 N.E.2d at 191. Banker's Bank might have been unwilling to give an indemnity without its own assurances from the originator's bank and the originator itself. If asked for assurances, Gray Eagle would have learned that it was a pawn in Duchow's fraud, which would have come ·to light. Even the absence of an indemnity does not necessarily leave Central Bank with the loss. On paying GECC, Central Bank will be subrogated to all of GECC's rights against Duchow. See UCC § 4A–303 Official Comment 2. It is, after all, Central Bank's customer Duchow who devised this scam and made off with the money, and it was Banker's Bank's error that put Central Bank in this pickle. Central Bank must pay GECC; whether Central Bank may be made whole remains to be seen.

REVERSED.