**NBASE COMMUNICATIONS, INC., a Maryland corporation, Plaintiff,**

v.

**AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO, a national bank association, and State Farm Mutual Insurance Company, an Illinois insurance company, Defendants.**

**No. 96 C 7297.**

United States District Court, N.D. Illinois, Eastern Division.

June 8, 1998.

---

Michael B. Weininger, Gregory T. Diamond, Katz, Randall & Weinberg, Chicago, IL, for Plaintiff.

Brian Todd Garelli, Lord, Bissell & Brook, Chicago, IL, Dennis Andrew Marks, Thomas Charles Kaufmann, Teresa Christine Kopriva, Querrey & Harrow, Ltd., Chicago, IL, for Defendants.

### MEMORANDUM OPINION

GRADY, District Judge.

The parties' cross motions for summary judgment are before the court. For the reasons explained below, both are denied.

### BACKGROUND

It must be a rare occurrence for a payment, mistakenly sent to a wrong address, to reach a recipient who may have a legitimate claim to it. But such is the case here.

Plaintiff NBase Communications, Inc. ("NBase"), seeks restitution on a theory of unjust enrichment from defendant American National Bank ("ANB") based on the following events: ANB was the lender and secured creditor of a company called Illinois Computer Cable ("ICC"). ICC sold computer networking products. (ICC filed for bankruptcy in September of 1996, shortly before the filing of this lawsuit.) The loan was secured by the receivables, which were sent by ICC's customers to a lock box at ANB.

One of ICC's customers was State Farm. Unlike other customers, State Farm did not send payments to the lock box at ANB because State Farm's account was unique in that ICC, when selling to State Farm, was acting as an undisclosed agent for NBase and selling NBase's products. Because of this arrangement with NBase, ICC wanted State Farm to remit payments to a lock box controlled by NBase and not to the lock box controlled by ANB.

Despite ICC's wishes, a State Farm payment ended up in the hands of ANB. This happened in April of 1996, when ICC issued two invoices to State Farm in the aggregate amount of $204,333.04. Both invoices listed two addresses for remittance. At the top of each invoice was the "remit to" address for the ANB lock box. At the bottom of each invoice was the "remit to" address for the NBase lock box. State Farm's payment supervisor approved the payments, highlighted the NBase lock box address on each one, and sent the invoices to State Farm's accounting department for payment. Instead of sending the payment to the highlighted address, State Farm's accounting department then sent the check (made payable to ICC) to the ANB lock box.

ANB received the check via the lock box on May 13, 1996. At that time, ICC owed ANB approximately $900,000 on its loan. Two days later, on May 15 at 10:18 a.m., an ICC employee named Patricia Sebby called ANB and said the check was mailed by mistake. Sebby said the check was not an ICC receivable and requested that it be returned to ICC by placing it in an operating account ICC maintained at ANB. ANB declined to do so. ANB posted the checks to ICC's account, thereby reducing the amount of ICC's

debt, although the facts are not clear on when this posting occurred.

NBase brought suit against ANB and State Farm, claiming entitlement to the money under a theory of unjust enrichment. (State Farm was voluntarily dismissed as a defendant in September of 1997.) The parties' cross motions for summary judgment are before the court. They agree that Illinois law governs this diversity case.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *O'Connor v. DePaul University*, 123 F.3d 665, 669 (7th Cir.1997). "A dispute over material facts is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Kennedy v. Children's Serv. Soc'y of Wis.*, 17 F.3d 980, 983 (7th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir.1995).

In response to NBase's claim of unjust enrichment and in its motion for summary judgment, ANB raises the affirmative defense of the "discharge for value" rule. The rule, in relevant part, says that

A creditor of another ... who has received from a third person any benefit in dis-

charge of the debt ... is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

RESTATEMENT OF RESTITUTION § 14 (1937) (hereinafter "Restatement"). NBase argues that ANB cannot prevail based on the discharge for value rule because (1) Illinois does not follow it; and (2) even if Illinois did, the rule, if applied here, does not compel judgment for ANB.

We begin with NBase's first argument. The Supreme Court of Illinois has never discussed the discharge for value rule or even mentioned it by name. It has cited § 14 of the Restatement once but not in a significant way. *See Ins. Board of Education of City of Chicago v. A.C. & S. Inc.* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 598 (1989) (including § 14 in a string citation for a general proposition about restitution law in Illinois). Our goal in diversity, then, is to determine whether the Illinois Supreme Court would follow the rule. *See Todd v. Societe Bic*, 21 F.3d 1402, 1405 (7th Cir.1994) ("federal court must determine issues of state law as it believes the highest court of the state would determine them") (internal citation omitted).

■ We believe Illinois would follow the discharge for value rule. At least one Illinois appellate court has applied the rule, *see Chicago Title & Trust Co. v. Walsh*, 34 Ill. App.3d 458, 340 N.E.2d 106, 110–11 (1975) (denying restitution because defendants "took payment in exchange for the discharge of a legitimate debt, without misrepresentation by them and without notice to them of [the] fraud];" describing exchange as a "bona fide discharge for value"), and no lower courts in Illinois have rejected the rule.[1]

---

1. Without much explanation, NBase suggests that Illinois courts do not apply the discharge for value rule in cases involving mistake and cites one case for this proposition, *St. Paul Fed. Sav. & Loan Assoc. v. Avant*, 135 Ill.App.3d 568, 90 Ill.Dec. 250, 481 N.E.2d 1050 (1985). But *St. Paul* does not even mention the discharge for value rule, much less reject its use in cases of mistake. It merely says that where money is

paid under a mistake of fact, the money may be recovered despite the fact that the recipient "was not guilty of deceit or unfairness." *Id.* at 1057. The fact that the discharge for value rule was not even mentioned cautions against concluding that *St. Paul* held that the rule does not apply. It is possible that the rule was not even argued to the court.

We also note that most jurisdictions appear to use the rule, which is an indication that Illinois would follow suit in the interest of uniformity. One scholar, in discussing the rule, has said that:

> In situations of endless variety, courts have denied restitution because money paid by one party was received in good faith by the other, in satisfaction of ... a valid claim against a third person.

3 George Palmer, *The Law of Restitution* § 16.6, n. 3 (1978) (hereinafter referred to as Palmer) (collecting cases applying the discharge for value rule); *see Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189, 198 (1991) (adopting the discharge for value rule in the context of wire transfers); *see also Gen. Elec. Capital Corp. v. Central Bank*, 49 F.3d 280, 286 (7th Cir.1995) (hereinafter referred to as *GECC*) (predicting that the Supreme Court of Wisconsin would follow *Banque Worms* and adopt the discharge for value rule in the context of wire transfers).[2] NBase has not cited a case from any jurisdiction that rejects the rule. Based on these considerations, we believe Illinois would follow the discharge for value rule.

A more difficult question is how the rule applies in these circumstances. To refresh, the rule is that

> A creditor of another ... who has received from a third person any benefit in discharge of the debt ... is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

Restatement § 14.

NBase does not really take issue with the presence of these basic elements in this case. Instead, it argues that a party availing itself of the discharge for value rule must have also provided value for the mistaken payment before receiving notice of the mistaken payment. NBase argues that ANB had notice before it gave value by crediting ICC's account. In response, ANB argues that if a party receives the mistaken payment before notice of the mistake, then the party is entitled to keep the payment regardless of whether the party detrimentally relied.[3]

■ Nothing in Illinois law directly addresses the issue presented by the parties, so we begin by analyzing § 14. In ANB's favor, it is true that § 14 does not explicitly require that the creditor have provided value. But this is not determinative because § 14 is not a statute that requires us to apply only its express language. Section 14 is complemented by its comments, which make clear that the Restatement's drafters contemplated having the rule apply only when the creditor has given value. For example, one comment explains that "it would be inequitable to require restitution from the transferee [4] *since, in the surrender of the debt or lien, he has given value* and acquired title to the money or other thing given in payment." Restate-

---

Moreover, the linchpin of the holding in *St. Paul* was that defendant "failed to demonstrate any legal or equitable right to retain" the monies paid under the mistaken belief. *Id.* Here, as will become clear below, ANB is arguing that the discharge for value rule provides it with the legal right to retain the monies, and that the policies underlying the rule provide it with the equitable right to retain them.

2. NBase argues that *GECC* and *Banque Worms* are distinguishable because they involved electronic wire transfers. It is true that wire transfers are different from the paper transfer that occurred here, but NBase has not explained why this difference warrants different treatment. Moreover, in interpreting *Banque Worms*, the *GECC* court said: "Although § 14 was devised for slow-moving paper transactions, [the *Banque Worms* court] thought it an apt rule for speedy wire transfers too." *GECC*, 49 F.3d at 284.

This quote suggests two things: first, that applying the rule to paper transactions is perfectly appropriate (because the rule was devised for such transactions); and secondly, that the distinction between wire and paper transfers would be significant only if we were deciding whether to *extend* the rule and apply it to wire transfers.

3. One notices a difference in the terminology used by the parties. NBase says that ANB must have "provided value"; ANB says that "detrimental reliance" is not required. We follow NBase's word choice (except in one necessary instance) because, as explained below, we believe an essential component of the discharge for value rule is the requirement that the creditor have provided value.

4. The Restatement also refers to the creditor as the "transferee" (because payment has been transferred to it).

ment § 14 cmt. b (emphasis added); *see also* Andrew Kull, *Rationalizing Restitution*, 83 Calif.L.Rev. 1191, 1238 (1995) (stating that "the real reach of the [discharge for value] defense in practice is sharply limited by the requirement that the recipient give something up on receipt of the mistaken payment").[5]

Another important consideration supporting NBase's view is that the discharge for value rule is a "specific application of the underlying principle of [§ 13's] bona fide purchase." Restatement § 14 cmt. a. The underlying principle is that "a person who innocently has acquired the title to something *for which he has paid value* is under no duty to restore it to one who would be entitled to" it. Restatement § 13 cmt. a (emphasis added). The principle is clear that value must have been given. And the Restatement's drafters explicitly said that this principle applies with equal force to § 14's discharge for value rule. *See id.* ("The same underlying principle also operates under the circumstances stated in § 14."); *id.* § 14 cmt. (a) ("Comment *a* on § 13 is applicable.").

The idea that a creditor must have given value is reflected in the sole Illinois appellate case applying the discharge for value rule (*Chicago Title* ). That case involved a debtor who set up an escrow account with a bank. 340 N.E.2d at 108. The bank, acting as the escrow agent, issued several drafts to the escrowee's numerous creditors. The bank sought the return of those drafts because the debtor had committed a fraud by funding the escrow with a forged certified check. *Id.* But by the time the bank discovered the fraud, the debtor (following the escrow procedure) had given the drafts to the creditors in exchange for certain legal documents of the creditors. *Id.* at 111. The issue before the court was whether the creditors had to return the drafts to the bank.

In applying the discharge for value rule, the court ruled that the creditors prevailed over the bank because the creditors "took

payment in exchange for the discharge of a legitimate debt, without misrepresentation by them and without notice to them of [the debtor's] fraud." *Id.* at 110–111. Although the court did not specifically mention that the creditors had "provided value" for the drafts (or that this was a requirement), it is fair to say that the court addressed this concept. The court mentioned, not once but twice, the fact that the creditors parted with legal documents in exchange for the drafts. *Id.; see also id.* at 111 (stating that the creditors "received payment in full while [the debtor] took delivery of his documents"). Although ANB relies on *Chicago Title* in arguing that Illinois applies the discharge for value rule, it does not discuss the fact that the creditors gave value in *Chicago Title*.

Cases from other jurisdictions that apply the discharge for value rule are similar to *Chicago Title* in that they also emphasize that creditors must give some sort of value. *See Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir.1981) (under Florida law, "[i]t is patently unfair to require an innocent payee who has received *and used the money to satisfy a debt* to repay the money") (emphasis added); *Commonwealth of Pennsylvania v. Collingdale Millwork Co.*, 71 Pa.Cmwlth. 286, 454 A.2d 1176, 1180 (1983) ("The rationale for [the discharge for value] rule is that the judgment creditor who by definition has an entitlement, is a bona fide purchaser for value *in giving up his claim* and is therefore not unjustly enriched.") (emphasis added); *Weiner v. Roof*, 19 Cal.2d 748, 122 P.2d 896 (1942) (holding that the act of crediting received funds to the account of a third-party debtor, in satisfaction of the debt, is a defense to the payor's action for restitution).

ANB gives no consideration to these authorities. Instead, it relies on two different cases. One is a New York case (*Banque Worms* ) holding that the discharge for value rule applies to electronic wire transfers. In the process of so holding, the opinion makes

---

**5.** The quid-pro-quo nature of the rule is reflected in its name: the "discharge *for value* " rule. The name itself suggests that the creditor must give value in exchange for the discharge (i.e., the payment).

The rule's name could be considered ambiguous because the word "discharge" normally re-

fers to a credit given to a debtor's account. For example, one might say that "the bank discharged my debt." But the Restatement's drafters used the word "discharge" to refer to the payment received by the creditor. The actual crediting of the antecedent debt "is the value or claimed value." Palmer § 16.5 n. 1.

clear that the discharge for value rule (as applied in New York) entitles the holder of a mistaken payment to keep such payment upon receipt "without the necessity of demonstrating detrimental reliance." 568 N.Y.S.2d 541, 570 N.E.2d at 191. The other is a case from the Seventh Circuit (*GECC*), holding that Wisconsin would follow *Banque Worms* in applying the discharge for value rule to electronic wire transfers. *GECC*, 49 F.3d at 286.

In ANB's view, these cases stand for the proposition that creditors should be able to keep mistaken payments upon receipt of those payments. There is language in *Banque Worms* to support ANB's view:

> When a beneficiary *receives money* to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the finds.

*Banque Worms*, 568 N.Y.S.2d 541, 570 N.E.2d at 196 (emphasis added).[6] The reason why creditors should be able to keep mistaken payments upon receipt is to further the policy goal of finality in business transactions. *Banque Worms*, 568 N.Y.S.2d 541, 570 N.E.2d at 196. Finality is important because

> [e]xposing creditors who thought that their debts had been paid off to a lengthy period of uncertainty during which they might be required to reverse the transfer would be the equivalent of pouring molasses on the payments system.

*GECC*, 49 F.3d at 284.[7] One way to avoid this "lengthy period of uncertainty," is to allow banks to keep mistaken payments upon receipt. This is what the *Banque Worms*

court did. ANB urges us to do the same, but for what we think are good reasons, we decline to do so.

We initially note that *Banque Worms* was based on several New York cases holding that in order to achieve finality in commercial transactions, possession of money vests title in the holder. *Banque Worms*, 568 N.Y.S.2d 541, 570 N.E.2d at 195–96. ANB has not demonstrated that Illinois case law establishes a similar tradition. Because we are sitting in diversity, we are reluctant simply to adopt another state's view that is clearly based on that state's tradition. Such methodology does not necessarily advance our goal of determining how the Illinois Supreme Court would resolve this issue. And it may even be harmful to the orderly development of Illinois' law. *See Factors Etc., Inc. v. Pro Arts Inc.*, 652 F.2d 278, 282 (2d Cir.1981), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982) ("One distinct shortcoming of diversity jurisdiction is the interruption of the orderly development and authoritative exposition of state law occasioned by sporadic federal court adjudications.").

More importantly, we disagree with *Banque Worms'* approach because it protects creditors who have done nothing more than receive a mistaken payment. We believe creditors must have given value (before receiving notice) in order to avail themselves of the discharge for value rule. Our preceding analysis demonstrates that this requirement is solidly rooted in the Restatement, an Illinois case (*Chicago Title*) and cases from other jurisdictions. Moreover, this approach does not undermine finality. It al-

---

**6.** There is also language in *GECC* to support ANB's view (although we note that the passage technically is the *GECC* court's explanation of *Banque Worms*):

> As the Court of Appeals [in *Banque Worms*] saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, *unless news of the error precedes arrival of the funds.*

*GECC*, 49 F.3d at 284 (emphasis added).

**7.** Incidentally, ANB's entire argument is that creditors need to be able to rely on payments they have *received*. But there is plenty of language in *GECC* suggesting that what creditors actually need to rely on is only payments they have *credited* to a debtor's account:

> [The discharge for value rule] promotes finality in commercial transactions. Wire transfers permit recipients to draw on funds immediately, and the velocity with which funds turn over can be considerable. Exposing creditors *who thought that their debts had been paid off* to a lengthy period of uncertainty *during which they might be required to reverse the transfer* would be the equivalent of pouring molasses on the payments system.... [A] creditor should be able to *treat funds credited in apparent payment of a debt* as irrevocably his, unless news of the error precedes arrival of the funds.

*GECC*, 49 F.3d at 284 (emphases added).

lows banks to keep mistaken payments after they have given value for them. Once value has been given, the creditor can treat the funds as irrevocably his. *See also* Kull, 83 Calif.L.Rev. at 1240 & n. 143 (in criticizing *Banque Worms* and *GECC*, suggesting that requiring a change of position would be "perfectly adequate to protect" the commercial need of being able to "rely on apparently good title").

Here, giving value means crediting the debtor's account.[8] Once credited, the creditor can treat the funds as irrevocably his— regardless of whether the credit can be easily reversed by the creditor.[9] The creditor will not "have to wonder whether it may retain the funds." *Banque Worms*, 568 N.Y.S.2d 541, 570 N.E.2d at 196. Nor will the creditor be exposed to a "lengthy period of uncertainty during which they might be required to reverse the transfer." *GECC*, 49 F.3d at 284; *see also, supra*, n. 7.

Requiring "value given" is also defensible on equitable grounds because it is difficult to see what is unfair about requiring a bank to return money if it was notified of the mistaken payment before it gave value for the payment. For example, only *after* the crediting would it be unfair to require the innocent creditor to make restitution. *See Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir. 1981) (under Florida law, "[i]t is patently unfair to require an innocent payee who has received *and used the money to satisfy a debt* to repay the money.") (emphasis added); *Commonwealth of Pennsylvania v. Collingdale Millwork Co.*, 71 Pa.Cmwlth. 286, 454 A.2d 1176, 1180 (1983) ("The rationale for [the discharge for value] rule is that the judgment creditor who by definition has an entitlement, is a bona fide purchaser for value *in giving up his claim* and is therefore not unjustly enriched.") (emphasis added).[10]

■ Turning to the facts of this case, the parties' factual statements establish that on May 13, 1996, ANB received (via the lock box account) a check from State Farm made payable to ICC in the amount of $204,333.04. Two days later, on May 15 at 10:18 a.m., an ICC employee named Patricia Sebby called the ANB employee partially responsible for the ICC bank accounts (Elena Ruiz) and told her that the check should be removed from ICC's "lock box" account because the deposit was not a receivable. Sebby told Ruiz that the payment was a mistake and asked if the check could be placed in ICC's operating

8. We are mindful that a creditor can give value in more ways than just by crediting a debtors' account. This opinion should not be interpreted to foreclose creditors from arguing that they gave value in other ways. Nevertheless, on the facts presented here, the crux of the factual dispute between the parties (as presented by NBase) is whether ANB had applied the State Farm payment to ICC's debt by the time ICC called. ANB has not presented a competing explanation of how it gave value, which is not surprising considering that it believes it was entitled to keep the payment upon receipt and regardless of whether it gave value.

We realize this reduces the inquiry to whether ANB performed a minor bookkeeping task before it received notice. This is not bothersome, however, because it is the performance of this very function that allows banks to avoid the state of uncertainty that the *GECC* court warned against creating. *Cf.* Palmer § 16.8 ("[T]o deny a defendant the protection given one who took for value because a payment takes [the form of a book entry] makes serious and undesirable inroads on the availability of a legitimate defense.").

9. One of NBase's arguments is that ANB did not give value because it could easily have reversed its crediting of the ICC account. ICC actually asked ANB to do so. Because we believe that in the interest of finality the creditor should be able to treat funds credited as irrevocably his, we reject this argument.

10. In restitution actions, there is also an affirmative defense of "change of position." The defense's name suggests its application: a defendant may argue that it has not been unjustly enriched because it has changed its position in reliance on the mistaken payment. Palmer § 16.8. It strikes us that by holding that the discharge for value affirmative defense requires "value" to have been given, one might argue that the defense is now the same as the "change of position" affirmative defense. Neither party addresses the possibility of this redundancy or its implications. Perhaps it is not a problem because the defenses differ in some significant way (e.g., the "change of position" must be more substantial than the "value provided"). If they are the same, perhaps it is not a problem because Illinois does not allow the "change of position" defense. Or (again assuming they are the same), perhaps Illinois courts would simply apply the discharge for value defense to a case where "change of position" could be applied. Palmer cites a case in which this last approach was taken (see *Weiner v. Roof*, 19 Cal.2d 748, 122 P.2d 896 (1942)) and implies that the approach is appropriate. Palmer § 16.8.

**1078**

account so that ICC could turn around and write a check to State Farm.

Ruiz transferred Sebby's call to Regina Gornick, an ANB employee who managed ICC's account at the relevant time. Gornick told Ruiz that after speaking with Sebby, Gornick would tell Ruiz how they would handle the problem. Sebby told Gornick that the money was not a receivable and did not belong to ICC. She also told Gornick that the money should have gone to another bank. The parties dispute whether Sebby told Gornick that the payment was a mistake, but as we shall see, this dispute is inconsequential to the resolution of the affirmative defense.

At this point, two ANB employees had been notified that the check was not a receivable. The remaining question is whether ANB had already given value for this check, which again, comes down to whether ANB had already credited ICC's account with the payment from the State Farm check. ANB claims that the crediting (referred to in bankspeak as a "pay down") had been completed by 9 a.m. on May 15, 1996 (the day Sebby called Ruiz). NBase claims that the pay down occurred *after* Sebby told Ruiz and Gornick that the payment was a mistake.

There is a genuine factual issue here because there is evidence supporting both sides, taken from the parties' 12(M) statements accompanying their respective summary judgment motions. On one hand, Gornick testified in her deposition that by 9 a.m. on May 15, as a result of the State Farm check, ICC could have drawn on its line of credit (suggesting that the pay down had already occurred by the time of Sebby's phone call at 10:18 a.m.). Defendant's 12(M) Statement, ¶ 18 (Deposition of Regina Gornick at p. 85). On the other hand, Ruiz testified that Gornick called her after speaking with Sebby and told her that they "were going to go on ahead and pay down" (suggesting that the pay down had not yet occurred). Plaintiff's 12(M) Statement, ¶ 48 (Deposition of Elena Ruiz at p. 40). These two pieces of evidence are the most direct for each side. There is additional, less probative evidence on each side. We find there is a genuine issue of material fact about whether notice preceded ANB's pay down of ICC's loan.

This genuine factual dispute prevents either party from prevailing on its motion for summary judgment.

### CONCLUSION

The parties' cross motions for summary judgment are denied.