*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0077p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In re: CALUMET FARM, INC.,

                                                *Debtor.*

_____

FIRST NATIONAL BANK & TRUST CO.,

                                                *Appellant,*

        *v.*

PETER M. BRANT and WHITE BIRCH FARM, INC.,

                                                *Appellees.*

No. 03-5533

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 02-00310—Karl S. Forester, District Judge.

Argued: December 2, 2004

Decided and Filed: February 17, 2005

Before: GILMAN and SUTTON, Circuit Judges; McKEAGUE, District Judge.[*]

---

## COUNSEL

**ARGUED:** William L. Montague, STOLL, KEENON & PARK, Lexington, Kentucky, for Appellant. William W. Allen, GESS, MATTINGLY & ATCHISON, Lexington, Kentucky, for Appellee. **ON BRIEF:** William L. Montague, STOLL, KEENON & PARK, Lexington, Kentucky, for Appellant. William W. Allen, C. Timothy Cone, GESS, MATTINGLY & ATCHISON, Lexington, Kentucky, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. This case arises out of a botched electronic wire transfer from Calumet Farm, Inc. to Peter M. Brant and White Birch Farm, Inc. (collectively, White Birch). On Friday, March 8, 1991, Calumet initiated the wire transfer of $77,301.58 by a payment order to its bank, First National Bank & Trust Company. This amount was calculated by Calumet

---

[*] The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

as a payment of interest on its outstanding debt of over $1 million due to White Birch.  When Calumet received written confirmation of the wire transfer from First National on the following Monday, March 11, 1991, it learned that $770,301.58, rather than $77,301.58, had mistakenly been transferred.  White Birch refused to return the additional $693,000, and Calumet subsequently declared bankruptcy.

First National is now seeking restitution from White Birch for the excess payment.  Both the bankruptcy court and district court ruled in favor of White Birch.  The key issue on appeal is whether White Birch established the elements of the "discharge-for-value" defense to First National's restitution claim.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for the entry of judgment in favor of First National.

## I.  BACKGROUND

Most of the facts of this case were previously set forth by this court in *In re Calumet Farm, Inc.*, No. 95-5953, 1997 WL 253278, at \*\*1-2 (6th Cir. May 14, 1997) (unpublished), as follows:

> White Birch is a thoroughbred horse farm in Connecticut owned by Peter Brant.  In 1986, Calumet purchased a one-half interest in the thoroughbred stallion Mogambo from White Birch and executed a $6,500,000 promissory note ("the Mogambo note") evidencing the obligation.  On October 31, 1990, Calumet defaulted in making its annual principal payment of [$1,300,000] on the debt.  Brant and J.T. Lundy, president of Calumet, reached an agreement whereby Calumet would make the payment on or before March 15, 1991.  Calumet also defaulted in making several intervening interest payments and, as of March 7, 1991, owed White Birch approximately $103,057.50 in interest and penalties.

> On March 8, 1991, Lundy instructed Calumet's bookkeeper, Angela Holleran [properly, "Hollearn"], to pay the interest due to White Birch as of January 31, 1991, amounting to $77,301.58.  Holleran thereupon called First National to arrange payment by wire transfer, and also called White Birch to inform it that a wire transfer payment was forthcoming; however, the substance of these conversations is disputed as to the amount that White Birch was to receive.  The wire transfer, referenced as "MOGAMBO INT," was made to White Birch's account at Citibank in New York on March 8, 1991.

> On March 11, 1991, Holleran received written confirmation of the wire transfer from First National and realized that $770,301.58, rather than $77,301.58, had been transferred. Holleran notified First National of the mistake and First National contacted Citibank to request reversal of the wire transfer.  Because the money already had been credited to White Birch's account, Citibank refused to reverse the wire transfer.  Thereafter, First National requested that Brant return the additional $693,000 erroneously transferred to him, but Brant refused to return the money unless First National acknowledged in writing that it had made the error in transferring the funds.

> On March 27, 1991, Calumet filed suit against First National in Scott County Circuit Court alleging negligence and breach of contract with respect to the mistaken wire transfer.  Because of Calumet's precarious financial condition, Calumet and First National reached a partial settlement whereby First National agreed to lend Calumet $500,000, secured by Calumet's interest in the Mogambo note.  Calumet also assigned to First National any right of recovery that it might possess against White Birch and agreed to release First National from any liability arising from the

wire transfer. Although First National and Calumet had partially settled the state court action, First National filed an answer and counterclaim [actually, a third-party complaint] on April 4, 1991, asserting claims against White Birch. In the meantime, White Birch filed a complaint against Calumet in the United States District Court for the Eastern District of Kentucky, seeking the principal and interest due on the Mogambo note.

On June 11, 1991, Calumet filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Kentucky. In October 1991, the state court actions were removed to the Bankruptcy Court as adversary proceedings, and on December 12, 1991, the district court action was referred to the bankruptcy court.

Upon cross-motions for summary judgment, the bankruptcy court entered partial summary judgment in favor of White Birch on December 22, 1993. The court held that First National lacked standing to assert a restitution claim against White Birch, reasoning that the amount of a wire transfer, once debited from a depositor's account, belongs solely to that depositor; accordingly, the court held that only Calumet possessed standing to recover the transferred funds from White Birch. However, because Calumet owed White Birch a sum well in excess of the amount of the wire transfer, the court held that White Birch had not been unjustly enriched and was not obligated to make restitution. The court then denied First National leave to file a second amended counterclaim to include claims for conversion and intentional interference with a contract, but allowed First National to assert other state-law claims.

On September 6, 1994, the bankruptcy court entered summary judgment in favor of White Birch on all remaining claims and entered its final order on October 27, 1994. [As part of the final settlement, First National agreed to pay Calumet $50,000 in addition to the $500,000 loan, which Calumet never repaid.] First National appealed the bankruptcy court's grant of summary judgment in favor of White Birch and the court's denial of leave to amend its counterclaim. The district court affirmed the bankruptcy court's decision in its entirety on June 13, 1995.

In May of 1997, this court reversed the grant of summary judgment in favor of White Birch, but also affirmed the denial of First National's motion for leave to amend its counterclaim. The case was remanded to the district court with instructions to return the matter to the bankruptcy court for further proceedings. This court held that "the bankruptcy court should make additional factual findings as to whether White Birch had notice that the funds transfer had been made in error and, thus, determine whether White Birch [could] successfully assert [the 'discharge-for-value'] defense to First National's restitution claim." 1997 WL 253278, at *5.

In resolving cross-motions for summary judgment, the bankruptcy court determined on remand that there was insufficient evidence in the record to support a finding that White Birch had notice of the error in the amount transferred before the funds were credited to its account at Citibank. It therefore held that White Birch had satisfied the required elements of the discharge-for-value defense to First National's restitution claim. Accordingly, the bankruptcy court granted summary judgment in favor of White Birch and denied the cross-motion filed by First National. In March of 2003, the district court affirmed both determinations. First National now appeals, claiming that the lower courts failed to properly interpret and apply the discharge-for-value defense asserted by White Birch.

## II. ANALYSIS

### A.        Standard of review

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.        The discharge-for-value defense

In its earlier opinion, this court held that First National had standing to assert a claim for restitution under U.C.C. § 4A-303(a) (enacted as § 355.4A-303(1) of the Kentucky Revised Statutes and incorporated into Federal Reserve Regulation J, 12 C.F.R. §§ 210.25-31, which governs funds transfers). Section § 4A-303(a) provides as follows:

> A receiving bank that (i) executes the payment order of the sender by issuing a payment order in an amount greater than the amount of the sender's order . . . is entitled to payment of the amount of the sender's order under Section 4A-402(c) if that subsection is otherwise satisfied. The bank is entitled to recover from the beneficiary of the erroneous order the excess payment received to the extent allowed by the law governing mistake and restitution.

This provision authorizes a bank to seek restitution from the beneficiary of the excess payment if the bank committed an error in executing the payment order. In the prior opinion, this court noted that § 4A-303(a) incorporates the discharge-for-value defense. 1997 WL 253278, at *4. The Restatement of Restitution defines the discharge-for-value defense as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, *if the transferee* made no misrepresentation and *did not have notice of the transferor's mistake*.

Restatement of Restitution § 14(1) (emphasis added). Thus, when a creditor receives what appears to be a payment on a debt from someone other than the debtor, the creditor becomes a bona fide purchaser and may keep the mistaken payment if the creditor discharges the obligation of its debtor prior to becoming aware of the mistake.

Section 14(1) of the Restatement, however, does not specify the point in time by which notice of the mistake must be received. Nor did this court's prior opinion in the present case address the issue. And the two other appellate courts that have concluded that the discharge-for-value rule applies to wire transfers also failed to focus on the timing question. *See Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1995) (*GECC*); *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 196 (N.Y. 1991).

Isolated language in both of the above cases, however, indicates that the notice must occur before the funds arrive. *See GECC*, 49 F.3d at 284 (holding that "a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds"); *Banque Worms*, 570 N.E.2d at 196 (explaining that "[w]hen a beneficiary

receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation"). But the question in each case (as in this court's prior decision) was *whether* the discharge-for-value rule applies in this setting, not *how* it applies. Nor, at any rate, does the quoted language squarely address the point. In a wire transfer setting, is the relevant event when the beneficiary's bank receives the money, or when the beneficiary learns that the money is in its account, or when the beneficiary credits the money to the debtor's account? Neither this court's prior decision, *GECC*, nor *Banque Worms* purports to consider the question, much less answer it.

Traditionally, the U.C.C. provides that payment in discharge of an obligation occurs under the first option—"at the time a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank in the funds transfer." U.C.C. § 4A-406(a). But this approach does not square with the notice exception to the discharge-for-value rule. Application of this U.C.C. definition of discharge would mean that the entity that must receive notice (here White Birch) is an entity other than the entity to whom the funds were wired (here Citibank). To divide the "receipt of payment" and "notice of error" elements between different entities makes little sense and at any rate is a recipe for reading the notice exception out of the rule.

Equally unpersuasive is the argument that the discharge-triggering event necessarily occurs only when the beneficiary has actual notice that funds have been placed in its account. Such notice may not connect the funds to a given debtor or to the size of the debtor's outstanding obligation. Furthermore, while actual notice of a mistake may of course be independently disclosed by the originator to the beneficiary, constructive notice of a mistake may also occur simply as a result of the size of the transfer when considered in connection with the name of the originator. In this case, for example, White Birch assuredly would have had constructive notice of the mistake if the transfer had been, say, for $7.7 million—if, in other words, First National had made a two-digit error rather than a one-digit error in transmitting Calumet's payment order. Any sensible application of the discharge-for-value rule in this unique setting must account for constructive as well as actual notice of a mistake.

That leaves what seems to us to be the most desirable option—that the discharge-for-value defense will apply unless the beneficiary receives notice of a mistake before the beneficiary of the transfer credits the debtor's account. In addition to aligning the entity that receives notice of any mistake with the entity that receives the payment, and permitting constructive notice to trigger the rule, this approach is consistent with one of the underlying principles of the discharge-for-value rule; namely, that the creditor has given value for the mistaken payment. Nor, despite White Birch's suggestion to the contrary, will this approach undermine the discharge-for-value rule on the theory that the rule will kick in only after the beneficiary on its own terms makes an accounting of how the transfer should be credited. The time value of money being what it is, most commercial recipients of such transfers can be counted on to promptly credit the debtor's account. As in most settings, at any rate, the rule applies only to commercially reasonable accountings.

We note that a district court decision directly on point followed a similar analysis. In *NBase Communications v. American National Bank & Trust,* 8 F. Supp. 2d 1071 (N.D. Ill. 1998), the court held that notice was sufficient so long as the beneficiary of the payment learned of the mistake before recovering the check from a lock box. In reaching that conclusion, the court noted that the creditor must give value for the mistaken payment—by crediting the debtor's account—before receiving notice of the mistake in order to invoke the discharge-for-value defense. *Id.* at 1076-77. Checks and wire transfers, we acknowledge, do not offer a perfect analogy. The former are governed by state law, the latter by federal law, and the two are governed by different sections of the U.C.C. But in the unique setting of applying the notice exception to the discharge-for-value rule, the reasoning of *NBase* aptly respects the principles of the rule and the realities of applying it to

checks and wire transfers: "[I]t is difficult to see what is unfair about requiring a bank to return money if it was notified of the mistaken payment before it gave value for the payment. For example, only *after* the crediting would it be unfair to require the innocent creditor to make restitution." *Id.* at 1077 (emphasis in original). So it is here.

Both the bankruptcy court and the district court, in taking up the case on remand, erred in focusing on when White Birch *received the funds* rather than on when White Birch *credited Calumet's account*. In doing so, both courts effectively wrote out the element of "discharge" from the discharge-for-value defense. The undisputed record shows that White Birch did not credit the funds to Calumet's account until the afternoon of March 11, 1991. First National offered the testimony of Calumet employee Angela Hollearn to prove that White Birch was aware well before then that Calumet had intended to wire only $77,301.58 to White Birch for the payment of accrued interest. The bankruptcy court ruled against First National on the basis that Hollearn's testimony was equivocal on the issue of to whom she spoke and what was said on March 8, 1991 when she allegedly conveyed to White Birch the fact that a wire transfer had been sent, the amount of the transfer, and how that amount had been calculated.

The district court likewise dismissed Hollearn's testimony on this point as too speculative. It therefore determined that First National had not established that White Birch had notice of the error before receiving the funds. Without deciding whether the lower courts erred in excluding the disputed testimony as a matter of law, *see M.B.A.F.B. Federal Credit Union v. Cumis Ins. Soc'y, Inc.*, 681 F.2d 930, 932 (4th Cir. 1982) (holding that a witness's testimony was admissible even though the witness admitted that it was only "possible" that he or his attorney had made certain statements), we note that there is no dispute that Hollearn notified White Birch of the error on the morning of March 11, 1991.

Furthermore, White Birch's behavior establishes that it was aware of the error as soon as it was informed of the wire transfer by its own bank. When White Birch discovered on the morning of March 11, 1991 that Citibank had credited its account for $770,301.58, it immediately transferred the additional $693,000 to Brant's personal account at Citibank, ostensibly so that "everything could be sorted out." It did not apply that amount to reduce Calumet's debt on the Mogambo note until later that day. If White Birch did not know or at least suspect that it had erroneously received the additional funds, it would have had no reason to segregate them into its owner's personal account. The fact that it segregated the precise amount of the overage, moreover, is strong evidence that White Birch knew exactly how much it was supposed to receive from Calumet. Even the wire transfer itself, after all, was referenced as "MOGAMBO *INT*." (Emphasis added.)

Thus, even if the bankruptcy court and district court correctly determined that White Birch did not have notice of the error before receiving the funds, White Birch certainly had notice before crediting Calumet's account. We therefore hold as a matter of law that White Birch had prior notice of the mistake in the funds transfer for purposes of the discharge-for-value rule and cannot avail itself of that defense. First National is therefore entitled to restitution from White Birch.

Under normal circumstances, the amount of restitution would be the $693,000 overpayment. But here First National was able to settle Calumet's claim against it for a total of $550,000. First National conceded at oral argument that this is the true extent of its loss, and thus the measure by which White Birch has been unjustly enriched at the bank's expense. Although White Birch has argued that $500,000 of the bank's claim was in the form of a loan to Calumet, the record makes clear that First National credited this amount to Calumet's account solely to settle the lawsuit filed against it as a result of the mistaken wire transfer. If the bank has in fact recovered any of this "loan" in the Calumet bankruptcy proceedings, the district court on remand can take this into account in rendering the final judgment against White Birch. The district court is also free to consider whether First National is entitled to prejudgment interest on its restitution claim.

As a final point, we note that allowing White Birch to keep funds that no one intended for it to have when it received them would constitute a windfall to White Birch at the expense of First National. Returning the $550,000 paid out by First National to extricate itself from its transmission error will, however, put the parties in the same position that they would have been in had the error in transferring the funds not occurred. Although these equitable considerations do not trump the discharge-for-value defense in situations where the defense is applicable, they are pertinent here. White Birch should, in fact, consider itself fortunate that it is having to return only $550,000 of the $693,000 excess it received because First National was able to settle with Calumet for less than the amount of the mistaken transfer.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for the entry of judgment in favor of First National.